Alexander WILLIAMS, by and through his Guardian, Conservator, and Next Friends, Douglas Williams and Lisa Williams; Douglas Williams; and Lisa Williams, Plaintiffs,

v.

FULTON COUNTY SCHOOL DISTRICT, et al., Defendants.

CIVIL ACTION NO. 1:14-CV-0296-AT

United States District Court, N.D. Georgia, Atlanta Division.

Signed March 31, 2016

Chris E. Vance, Office of Chris E. Vance, P.C., Atlanta, GA, for Plaintiffs.

Brandon Moulard, Charles T. Huddleston, Neeru Gupta, Nelson Mullins Riley & Scarborough, Mary Anne Ackourey, William H. Buechner, Jr., Freeman Mathis & Gary, Lawrence Brannen Domenico, Mozley, Finlayson & Loggins, LLP, Atlanta, GA, Barbara M. Heyne, John D. Wales, Law Offices of John D. Wales, Marietta, GA, for Defendants.

## ORDER

Amy Totenberg, United States District Judge

Alex Williams is a young man with disabilities who was born with hydrocephalus, hemiparesis, cerebral palsy, moderate to severe intellectual disabilities, motor and language impairment, and who has a history of seizures. (Compl. ¶ 1.)[1] Alex allegedly suffered horrific abuse at the hands of his special education teacher, Melanie Pickens, while enrolled at Hopewell Middle School during the 2006–2007 school year. Alex's counsel filed a 176–page Complaint with 23 counts against the Fulton County School District ("FCSD") and 28 individuals, including Pickens.[2] With his parents (together, "Plaintiffs"), he brings claims under the United States and Georgia constitutions and 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 701 *et seq.*, and under a variety of state law tort theories.

This case is frustrating and saddening for the Court for a number of reasons. The pleadings allege a series of shocking abuses visited upon Alex and other disabled

---

1. All citations to the "Complaint" refer to the Second Amended Complaint and the exhibits thereto. (Doc. 84.)

2. The Complaint was filed by, through, and with his guardian, conservator, and next friends, his parents Douglas and Lisa Williams.

students at Hopewell's "G–Hall," where classrooms for disabled students were located. Alex also alleges a pattern of institutional neglect and indifference to Pickens' alleged abuse that, if substantiated in discovery, would be terrible in its own right. And so this case presents important issues for all parties. For Alex, he has a strong interest in attempting to obtain some remedy for the alleged constant victimization that he suffered for an entire school year. For the Defendants, they have an obvious interest in trying to clear their names. Under any circumstances, the resolution of the issues posed by this case would be difficult. The presentation of this matter—in the form of a massive Complaint that pleads substantial factual material but in a scattershot fashion—has made that task even more difficult.

As a final preliminary note, every lawyer must help his or her client weigh the proper balance between, on the one hand, fully vindicating the client's rights, and on the other, reaching an expeditious resolution of a matter. As will be discussed below, the Court is declining to dismiss a significant number of individual Defendants at this stage, because it is constrained to do so. The Federal Rules permit a generous pleading standard, and the applicable law suggests that Plaintiffs have, with respect to many of the Defendants, met that standard. But this by no means suggests that all of the claims that survive this Order will necessarily survive summary judgment too. For example, the case law makes plain that while it is not particularly difficult to allege a *Monell* claim against a school district, it is often difficult to prove it. The same holds true for individuals who are being sued in their supervisory capacity or under a conspiracy theory of liability. Plaintiffs can prosecute their case how they like. But in the Court's view, this case would benefit greatly from some self-editing. Plaintiffs may decline to do so—but if that is the case, then they may wait a very

long time for a resolution to this undoubtedly painful matter. That would be a disservice to all involved.

## I. Summary of the Order

Pending before the Court are three motions. The Fulton County School District and all individual Defendants except Ms. Boyd and Ms. Pickens (hereinafter referred to as the "Individual Defendants") filed a Motion to Dismiss the Second Amended Complaint [Doc. 87] ("FCSD's Motion"). Ms. Boyd also filed a separate Motion to Dismiss [Doc. 101], and Ms. Pickens filed a Motion for Judgment on the Pleadings [Doc. 104]. Plaintiffs have indicated that they have reached a settlement with Pickens. The Court therefore **DENIES WITHOUT PREJUDICE** Pickens' Motion for Judgment on the Pleadings [Doc. 104], and addresses the remaining motions in the following order:

The Court addresses the issues raised in the remaining motions in the following order: (1) FCSD's motion as to the issue of municipal liability; (2) Boyd's motion as to the issues of supervisory liability and qualified immunity; (3) the individual substantive claims; (4) official immunity as to the Individual Defendants and Boyd; (5) the § 1983 conspiracy claims; and (6) supervisory liability and negligent hiring and supervision claims against the Individual Defendants.

The Court provides the following summary to aid the Parties' understanding of the Order's determination of the various issues raised by Defendants in response to Plaintiffs' Complaint:

1. Melanie Pickens' Motion [Doc. 104] is **DENIED WITHOUT PREJUDICE as MOOT.**

2. Frances Boyd's Motion [Doc. 101] is **GRANTED** in part and **DENIED** in part. Plaintiffs' ADA and Section 504 claims under the Rehabilitation Act,

and their Fourth Amendment and cruel and unusual punishment claims, and their negligent hiring claims are all **DISMISSED**. Thus, the following claims remain pending against Boyd:

- the § 1983 claims for substantive and procedural due process and equal protection violations (under supervisory liability);
- the § 1983 conspiracy claims for substantive and procedural due process and equal protection violation;
- the Georgia constitutional claims for substantive and procedural due process and equal protection violations (under supervisory or conspiracy liability); and
- and the state law conspiracy claims to commit the torts identified in Counts 2 through 10, and the state law negligent supervision claim.

3. FCSD's Motion [Doc. 87] is **GRANTED** in part and **DENIED** in part. Plaintiffs' Fourth Amendment and cruel and unusual punishment claims against FCSD are all **DISMISSED**. The following claims remain pending against FCSD:

- the § 1983 claims for substantive and procedural due process and equal protection violations;
- the § 1983 conspiracy claims for substantive and procedural due process and equal protection violations;
- the Georgia constitutional claims for substantive and procedural due process and equal protection violations;
- the ADA and Section 504 claims; and
- the attorneys' fees claim.

4. The Individual Defendants' Motion [Doc. 87] is **GRANTED** in part and **DENIED** in part as follows:

- All claims against Defendants Etris, Butler, Averett, White, McGee, and Sosebee are **DISMISSED**.
- All claims against McConnell, Pettes, Shelley, Faulkner, Wadel, and Ware *except* Plaintiffs' claims under § 1983 for supervisory liability for violations of Plaintiffs' substantive and procedural due process and equal protection rights are **DISMISSED**.
- All claims against Beasley, Schuette, Wilson, Weinmann, Kanner, and Wade *except* Plaintiffs' § 1983 conspiracy claims to violate Plaintiffs' substantive and procedural due process and equal protection rights are **DISMISSED**.
- All claims against Merritt, Denmark, Lynch, Thompson, Shaffer, Vanairsdale, Reece, and Young *except* Plaintiffs' § 1983 claim for supervisory liability *and* conspiracy liability for violations of Plaintiffs' substantive and procedural due process and equal protection rights are **DISMISSED**.

5. In sum, the following claims **remain** pending against the specified Defendants:

a. § 1983 substantive and procedural due process and equal protection claims via municipal liability: FCSD;

b. § 1983 substantive and procedural due process and equal protection claims via supervisory liability: Boyd, Merritt, Denmark, Lynch, Thompson, McConnell, Wadel, Shaffer, Vanairsdale, Reece, Young, Pettes, Shelley, Faulkner, and Ware;

c. § 1983 substantive and procedural due process and equal protection claims via conspiracy liability:

Boyd, Kanner, Weinmann, Beasley, Schuette, Wilson, Wade, Merritt, Denmark, Lynch, Thompson, Shaffer, Vanairsdale, Reece, Young, and FCSD;

d. Substantive and procedural due process and equal protection claims under the Georgia constitution: FCSD and Boyd;

e. State law tort claims: Boyd (under a conspiracy theory of liability);

f. State law negligent supervision claim: Boyd;

g. ADA and Section 504 claims: FCSD; and

h. Attorneys' fees under the Individuals with Disabilities in Education Act ("IDEA"): FCSD.

## II. Legal Standards

■■■ This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1216 (3d ed.2002); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the well-pleaded factual allegations therein as true. *See Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir.1993). The plaintiff need not have provided "detailed factual allegations" to survive dismissal, but the

"obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Twombly* at 556, 127 S.Ct. 1955. But the allegations must still be "plausible." *Id.* at 547, 127 S.Ct. 1955.

## III. Background [3]

Alex Williams is a young man with cerebral palsy, severe intellectual disabilities, and motor and language impairment. (Compl. ¶ 1.) Alex was born with "hydrocephalus, a mid-brain abnormality that prevents spinal fluid from draining away from the brain. He also has a history of seizures, and is significantly developmentally delayed." (Final Decision ¶ 1.) On a 2010 psycho-educational evaluation, Alex earned "a full-scale IQ score of 40." (*Id.*) And Alex has very limited verbal communication skills. (*See id.* ¶ 15.) Although he is able to walk independently, he does so slowly and with a significant gait, has some difficulties in maintaining balance and stability, and occasionally falls. (*Id.* ¶¶ 31, 45–46.)

**3.** Consistent with the standard above, the Court takes the following facts as true. The Court relies on both the allegations in the Second Amended Complaint, and Administrative Law Judge Schroer's thorough and well-reasoned Final Decision on Alex's Individuals with Disabilities Education Improvement Act of 2004 ("IDEA") due process complaint, which found that FCSD had violated Alex's right to a free and appropriate public education. That decision was attached as Exhibit B to the Second Amended Complaint. And Plaintiffs incorporated the facts of that Final Decision by stating in their Complaint that "[t]he facts set forth in the Final Order attached [to the Complaint] as Exhibit B in paragraphs 1–2 and 15–42 ... and in the footnote citations to those paragraphs are true and accurate." (Compl. ¶ 27.)

All told, Alex's disabilities "substantially limited most, if not all, of his major life activities, including . . . his ability to learn, care for himself, perform daily living skills, complete any motor tasks with skill or speed, walk, speak, work, follow directions, and comprehend." (Compl. ¶ 152.) At the times relevant to the Complaint, Alex "could not dress himself, could not bathe himself independently . . . could not prepare food for himself . . . could not pour himself a glass of liquid . . . could not use the toilet independently, [ ] could not write, [and] could not read." (*Id.* ¶ 153.)

Alex was a student at Hopewell Middle School during the 2006–07 school year, where his teacher was Melanie Pickens. (*Id.* ¶ 26.) Pickens allegedly had a long history of abusing students, even before Alex arrived in her classroom, which the Court discusses next in order to give an overview of the events that led to this lawsuit. (*See generally* Compl.)

### The 2002 Abuse Allegations

Ms. Pickens began working for FCSD in 2002 as a special education teacher for moderately, severely, and profoundly disabled students at Holcomb Bridge Middle School. (*Id.* ¶ 172.) Pickens was not certified to be a lead teacher of middle school children with significant mental impairments. (Compl. ¶ 411.) Shortly after Pickens began teaching at Holcomb Bridge, she started "hitting, yanking, shoving, and screaming" at her students, and called them names. (*Id.* ¶ 174.) She also abandoned them in "time out" rooms with the lights out.[4] (*Id.*; *see also* Final Decision ¶ 20.) Pickens' misconduct was noticed early on by FCSD staff. Dorothy Pettes, a Special Education Coordinator who super-

vised special education teachers at a number of middle schools in the District, began receiving reports about Pickens in 2002 from teachers and paraprofessionals. (*Id.* ¶ 413.) Pettes, in turn, reported this conduct to several FCSD employees, including Emmett Shaffer, the principal of Holcomb Bridge, Nancy Shelley, the Executive Director for FCSD Services for Exceptional Children, Sharon Etris, the Instructional Support Teacher ("IST") at Holcomb Bridge; Donna Faulkner, the FCSD IST for students with moderate and severe mental impairments, and Sharon Butler, a Behavior Interventionist. (Compl. ¶¶ 396, 414.)[5]

Some of these individuals allegedly knew of Pickens' abuse from sources other than Pettes. For example, Butler witnessed at least some of this conduct firsthand, and knew that Pickens was restraining, isolating, and abandoning disabled students while at Holcomb Bridge. (Compl. ¶ 239.) And Etris "received numerous reports of abuse" from August 2002 to May 2004. (Compl. ¶ 188.)

In response to Pickens' alleged misconduct, Pettes and Faulkner arranged for Pickens to receive support and training during her time at Holcomb Bridge. Faulkner provided some of this instruction herself, sharing with Pickens teaching strategies, behavior management programming, and data collection techniques. (Compl. ¶ 201; Final Decision ¶ 20.) In addition, Butler informed Pickens that she was not permitted to physically punish or restrain children. (Compl. ¶ 238.) However, Pickens failed to respond to her training, and instead continued to be "abusive and excessively physically punitive" towards

---

4. The Complaint alleges that Pickens was abusing multiple children from 2002 through 2004, but only specifically identifies Corey Carlson as a victim during that time period. (Compl. ¶ 192.)

5. Etris received "numerous reports" of abuse from August 2002 through 2004. However, it is unclear if all of these reports were from Pettes, or from other individuals. (Compl. 188.)

her students. (Compl. ¶ 206.) Faulkner, Pettes, and Butler were all aware that Pickens had failed to change her ways despite receiving corrective training. (*Id.* ¶¶ 207, 240.)

Pettes therefore recommended in 2003 that Pickens' contract not be renewed at the end of her first year. (Compl. ¶¶ 201, 415; Final Decision ¶ 20.) However, Principal Shaffer informed Pettes that the decision to retain Pickens was a "personnel matter," and that Pickens would stay on at Holcomb Bridge. (*Ids.*) None of the above-named individuals reported Pickens' 2002 conduct to the police or other state authorities at the time that it happened. And all indications suggest (and the Complaint pleads) that Pickens continued abusing students for the remainder of her time at Holcomb Bridge. (Compl. ¶¶ 396, 399) (alleging that Pettes reported that Pickens was abusing her students "multiple times between 2002 and 2004.")

### The November 2004 Abuse Allegations

Despite her repeated misconduct, Pickens was transferred from Holcomb Bridge to Hopewell Middle School in the fall of 2004. (Compl. ¶ 255.) Prior to this transfer, Pettes informed Frances Boyd, the principal of Hopewell, that Pickens had a history of "ongoing issues" related to her "mistreatment and rough treatment" of her significantly disabled students. (*Id.*) Nonetheless, Pickens was assigned to teach a special education class on G Hall, a segregated hallway where only disabled children were located. (*Id.* ¶ 256.)

Pickens began abusing her new Hopewell students almost immediately after arriving. (*Id.* ¶ 258.) By September of 2004, Boyd was informed by at least one Hopewell employee that Pickens was "abusing and excessively . . . punishing" her significantly mentally impaired students.[6] (*Id.*) Then, in November of 2004, a FCSD school nurse named Judy Reddick reported to Principal Boyd and Paula Merritt, Hopewell's Special Education IST, that she had witnessed Pickens frequently strike her student Jake Marshall hard on the head with an open hand, spray Lysol on another student, Repheka Persadi, and repeatedly call her students "little shits" and "little fuckers." (*Id.* ¶ 259; Final Decision at ¶¶ 21–22.) Boyd had also received reports by this time that Pickens was pressing her buttocks and breasts in disabled children's faces. (Compl. ¶ 112.)

Reddick initially met with Principal Boyd about what she had seen, but Boyd "did not appear to believe her." (Final Decision ¶ 23; *see* Compl. ¶ 272.) Reddick then reported the abuse to her supervisor, Lynn Meadows, who in turn reported Pickens to FCSD's internal social worker department. (*Id.* ¶ 244.) Boyd informed Reddick she was displeased that Reddick had gone to Meadows rather than keep the matter in-house. (*See* Compl. ¶ 272.)

FCSD then assigned Stephanie Schuette, a social worker, to investigate the report(s) of abuse. (Compl. ¶ 342.) However, according to Plaintiffs, Schuette's investigation was tainted almost from the start. Plaintiffs allege that Boyd invited Michael Vanairsdale, the Superintendent of FCSD, Vicki Denmark, the FCSD Area Superintendent with responsibility for Hopewell, Ralph Lynch, the FCSD Interim Superintendent and Director of Secondary Personnel,[7] J. Randall Reece, the FCSD Chief Human Resources Officer, and Lance Young, the FCSD Human Resources Administrator, into the investigative process. Together, these senior FCSD officials allegedly predetermined

---

6. Pettes also received reports of Pickens abusing her new Hopewell students, beginning in "August of September 2004." (Compl. ¶ 417.)

7. Lynch reported to Vanairsdale. (Compl. ¶ 373.)

that Pickens' abuse "would not be reported" to the Georgia Department of Family and Child Services, the police, or the Georgia Public School Commission. (Compl. ¶¶ 245–246.)

These officials allegedly communicated this decision to Schuette's supervisor, Harvey Beasley, the director of FCSD social work services. (Compl. ¶¶ 385, 387.) Beasley, "[a]cting in agreement with Vanairsdale, Reece, Young, Boyd, Lynch, and Denmark," consequently "violated his department's protocol and usual policy and practice" and instructed Schuette to conclude that what Pickens had done to her students in the fall of 2004 was not abuse. (Id. ¶ 388, 389, 392.)

Schuette's investigation was minimal as a result. She began the investigation on November 18, concluded it on November 19, only interviewed Pickens herself, and did not take statements from any other witnesses. (Compl. ¶¶ 345, 352.) Schuette then prepared an Investigative Report, but altered her original draft and made a finding of "no abuse" on November 22, 2004, after receiving Beasley's directions. (Compl. ¶¶ 348, 352.)[8] And Schuette omitted facts that were reported to her, including that Pickens was allegedly slapping a student's hands and restraining him in a room alone. In the end, Schuette characterized Pickens' conduct as "poor choices and discipline strategies." (Compl. ¶ 359.)

Ultimately, Vainarsdale, Boyd, Lynch, Denmark, Young, and Reece all allegedly elected to retain Pickens, and allowed her to stay in the classroom without any real corrective action. (E.g., Id. ¶¶ 225, 247.) According to the Complaint, at least 13 individuals, including Boyd, Vanairsdale, Lynch, Denmark, Young, Reece, Merritt, Beasley, Schuette, Pettes, Shelley, William Thompson (a Hopewell assistant principal),

and Kenneth McGee, another FCSD social worker, were allegedly aware of the content of the reports at the time of the investigation—including the nature of the abuse allegations. (E.g., Compl. ¶ 225.)

## The Abuse Allegedly Continues After the 2004 Report

Pickens' abusive conduct towards her students allegedly "continued unabated," after she faced no consequences for the November 2004 incidents. (See Final Decision ¶ 24.) Principal Boyd and Merritt, in particular, continued receiving regular reports of abuse during the 2004–05 and 2005–06 school years. (Compl. ¶¶ 285; 319, 332, 443, 447) (Merritt was aware in May 2005 of "significant problems of child abuse in Pickens' class.") For example, in January 2006, a FCSD nurse named Terri Goodman reported to Boyd that Pickens had (1) told one disabled child that his mother was a "crack-head," and (2) "jacked up" another child by pushing him or her into a hard surface and then lifting his or her feet off the floor. (Compl. ¶¶ 280, 461; Final Decision ¶¶ 24–25.) The Administrative Law Judge observed that "[t]hese were just two of many reports made by staff at Hopewell to either [Merritt] or to Boyd about Pickens' conduct" between 2004 and 2006. (Final Decision ¶ 26.)

The Complaint and Final Decision detail several other reports of Pickens' abuse. According to Clarenda Baugh, a paraprofessional who worked in Pickens' classroom, it was "common knowledge on G–Hall that Pickens was abusing students, and the abuse was happening 'pretty much' on a daily basis." (Final Decision ¶ 26.)

Sara Ware, a FCSD Special Education Coordinator, was informed that "during one of the [summer] ESY programs from

---

8. The Complaint does not specify if Schuette's original draft made a finding of abuse. Drawing all inferences in Plaintiffs' favor, the Court assumes that it did.

2003 to 2006," Pickens squeezed the penis of a disabled child so hard that it gave the student a penile embolism, but Ware allegedly never passed this information on. (Compl. ¶ 437.)

Templyn Averett, a Hopewell special education teacher and co-chair of the Hopewell special education department from 2004 through 2006, witnessed Pickens "kick, hit, slap, push, shove, jack up, and knee one or more students; scream and curse at students; and restrain, isolate, and abandon students." (*Id.* ¶ 441.) Averett reported this abuse to both the IST Merritt and to Principal Boyd, but did not report it to any other person in a position of authority. (*Id.* ¶ 444.)

Another special education teacher, Stacy White, witnessed Pickens' abuse of students "shortly after" she arrived at Hopewell in August 2005, and reported it to Averett. (*Id.* ¶ 450.) Specifically, White saw Pickens hit one student "many, many times," saw Pickens push students up against the wall face-first, lift them off the floor, and shove them to the ground, and saw Pickens restrain and abandon a student for up to four hours a day, repeatedly. (*Id.* ¶¶ 459–68.) White reported at least some of this abuse to Averett and Pettes. (*Id.* ¶¶ 452, 457.) When paraprofessionals or other school employees complained to White about Pickens' conduct, she told them it was being addressed by the school administration. (*Id.* ¶¶ 452–53.)

Sara Sosebee, a FCSD special education teacher, allegedly befriended Pickens despite knowing that Pickens "kick[ed], knee[d], hit, slapped, push[ed] and shove[d]" students. According to Plaintiffs, Sosebee knew of Pickens' abusive tendencies when she recommended that Alex be placed with Pickens at Hopewell, and intentionally concealed that fact. (*Id.* ¶ 475.)

Defendant Kenneth McGee, a FCSD social worker, also received reports of abuse (though there are no allegations he wit-

nessed it firsthand), and discussed these reports with Boyd. However, he too never pushed it up the ladder. (*Id.* ¶¶ 484–485.)

And Pettes, who continued to "repeatedly" receive reports of Pickens' abuse, "expressed the Hopewell's staff's concerns about Pickens['] abuse and excessive punishment of her students to Boyd every time she was at Hopewell and Boyd was in the building." (Compl. ¶ 430.)

### Principal Boyd's Role in Pickens' Ongoing Abuse

Just like at Holcomb Bridge, and just like in 2004, nothing happened to Pickens in 2005 or 2006. The Complaint suggests that much of the reason for that lies with Principal Boyd. The Complaint alleges facts that, if true, suggest that Principal Boyd knew Pickens was repeatedly abusing children during this time.

Boyd received reports from bus drivers, parents of non-disabled children, at least two paraprofessionals, a FCSD nurse, at least one teacher, and a janitor who witnessed abuse or other improper conduct by Pickens against disabled students. (Compl. ¶ 264.) All told, Boyd received at least 10 detailed reports of abuse between August 2004 and August 2006. (*Id.* ¶ 112.)

And Boyd had "numerous conversations with Pettes and Merritt about Pickens' "physical and verbal improper acts [against] significantly disabled children." (Compl. ¶¶ 262–63.) Boyd also e-mailed Pickens at least twice in November of 2006, informing Pickens she was "not to use physical force to make [one of her student's] comply" with a request, and e-mailed Pickens, Merritt, and others about an incident where a parent witnessed a teacher (apparently Pickens) dragging a student down the hallway by their coat." (*Id.* ¶¶ 296–97.) The Complaint alleges that Boyd knew she had a problem. For example, when a school nurse went to Boyd to report Pickens, Boyd asked, "Now what

has Melanie [Pickens] done?" before the nurse mentioned Pickens' name. (*Id.* ¶ 284.)

Instead of remedying this situation, Boyd allegedly cultivated an "atmosphere of intimidation" at Hopewell that discouraged reporting abuse, with the result that "many of the educators and staff were afraid they would lose their jobs if they continued to make reports about Pickens." (Final Decision ¶ 27; Compl. ¶¶ 271–276.) Boyd allegedly fomented this atmosphere in a few ways.

First, Boyd did little to nothing in response to reports of abuse. The Administrative Law Judge found that Boyd would respond to verbal reports by taking no action and stating, "[i]f it's not in writing, it didn't happen." (Final Decision ¶ 27.) Alternatively, Boyd would falsely inform individuals who reported Pickens that the matter was being handled internally, and that Boyd was "tak[ing] care of it … [and] doing what I'm supposed to be doing." (*Id.* ¶ 26.) And Boyd instructed Merritt that any parent who inquired about Pickens' behavior towards disabled students was to be told that the matter was being addressed by the administration. (Final Decision ¶ 26; Compl. ¶¶ 267, 270.) Pettes testified at the due process hearing that staff "kept reporting [abuse to Boyd and others] and they felt nothing was getting done." (Final Decision ¶ 26.)

Worse, Boyd "appeared to be protective of Pickens." (Final Decision ¶ 27.) She informed Pickens when individuals had reported her, and stated to Pickens "I'm so sorry. It looks like they're picking on you again," after receiving one verbal report from an educator. (Compl. ¶ 275; Final Decision ¶ 27.) Boyd allegedly told Reddick in 2004 that she was displeased that Reddick had reported Pickens, and subsequently informed Reddick that she did not want her at Hopewell any longer. (Compl. ¶ 273.) And Boyd informed a janitor who

had reported witnessing abuse that the janitor was "never [to] call a parent about the mistreatment of a student," and copied the janitor's supervisor on a letter reiterating that point. (*Id.* ¶ 276.) Finally, Boyd allegedly did ask for a written report on a few occasions, but then destroyed it. (Compl. ¶ 291.)

Plaintiffs' allegations, if true, suggest that Boyd's combination of inaction in response to reports of Pickens' abuse and thinly-veiled hostility towards the educators who reported abuse resulted in an environment where Pickens essentially had free reign to harm her students.

Boyd's attitude appeared to trickle down to some of her other employees. For example, Merritt, the Hopewell IST, received reports of Pickens' abuse from at least eight individuals between 2004 and 2006, including from teachers, paraprofessionals, a Hopewell janitor, and parents of students. (Compl. ¶ 304.) Merritt herself allegedly witnessed Pickens knee and kick a student. (Compl. ¶ 310.) However, Merritt allegedly did not report this information to outside authorities, and "intentionally lied to those who would report Pickens' abuse … by telling them the matter was being taken care of." (*Id.* ¶ 312.) She was also dismissive of parents' concerns about their disabled children's struggles at Hopewell. (Compl. ¶¶ 314–318, 336.) Merritt also followed Boyd's lead in allowing Pickens to confront individuals who reported her. For example, when White reported Pickens, Merritt "made … White attend a meeting with Pickens and tell Pickens what White had reported." (*Id.* ¶ 327.)

Other Hopewell and FCSD employees were allegedly aware of the abuse between 2004 and 2007 but did little to nothing. Nancy Wadel, the Executive Director for FCSD Services for Exceptional Children, William Thompson and Sara McConnell, assistant principals at Hopewell, and Kar-

en Weinmann, the Hopewell IST as of 2006, all allegedly received reports of Pickens' abuse. (Compl. ¶¶ 407, 494, 505–06, 508–11.) According to Plaintiffs, none of these individuals took any significant action.

For example, Thompson was allegedly informed as early as 2004 that Pickens was harming children, and discussed the reports of Pickens' abuse with Boyd, Merritt, White, Averett, and Pettes. (Compl. ¶ 494.) Like Boyd and Merritt, Thompson allegedly responded to reports of abuse made to him by informing the reporter that it was "being handled," but did nothing of substance. (*Id.* ¶ 495.) Assistant Principal McConnell did not arrive at Hopewell until 2006, but allegedly learned of Pickens' abuse shortly thereafter. (*Id.* ¶ 505.) McConnell discussed Pickens' abuse with Boyd, Merritt, and Thompson, but never reported the abuse to any higher authorities. (*Id.* ¶ 506.) Wadel, who supervised Pettes, was informed of "continued reports of mistreatment by Pickens from 2004 to May 2007" but did not report it. (*Id.* ¶ 407.)

And Thompson and Weinmann, in particular, allegedly adopted Boyd's practice of discouraging reporting. Thompson allegedly helped stymie Schuette's 2004 social worker's investigation, and Thompson and Weinmann both allegedly told teachers to refrain from telling parents that their children had been abused. (*E.g., id.* ¶¶ 508–511.)

### Pickens' Abuse of Plaintiff During the 2006–07 School Year

Most of what the Court has just discussed allegedly occurred between 2004 and the spring of 2006. According to the Administrative Law Judge's Final Decision, "Pickens' abusive conduct toward her students worsened during the 2006–07 school year." (Final Decision ¶ 29.) That same year, Plaintiff Alex Williams arrived at Hopewell as a "happy, thirteen-year-old boy." (Final Decision ¶ 28.) Although Alex faced significant obstacles in life due to his disabilities, he had been learning important tasks and improving his behavior, and "was making progress toward his IEP goals and objectives and … enjoyed going to school." (*Id.*)

Alex allegedly quickly became a victim of Pickens' abusive conduct. Pickens "pushed Alex down multiple times on hard tile flooring" and on cement or pavement; jerked him down to the ground by grabbing his book bag or a limb and yanking it; pushed him for not walking fast enough, despite the fact that he had cerebral palsy; threw his book bag at him hard enough to knock him down; and "violently slammed" Alex's face into metal lockers "almost every day." (Compl. ¶¶ 28–46.) The reason for at least some of these actions was, apparently, because "Alex did not walk fast enough for Pickens, did not pay enough attention for Pickens, did not put his belongings into the locker" or did some other unidentified action that Pickens found inappropriate. (Compl. ¶ 48.)

Pickens also emotionally abused Alex. She abandoned him on a school bus, deprived him of his lunch for two days a week on average, and physically restrained him by affixing him to a Rifton chair in an unlit closet-like room that had a toilet, for "30 minutes to hours at a time." (*Id.* ¶¶ 82–85.) Sometimes Pickens allegedly intentionally placed demands on Alex that he could not meet—like requiring that he write when he didn't know how to—so that she could "excessively and unduly severely punish him." (*Id.* ¶ 54.)

And Pickens regularly acted abusively towards Alex's classmates in front of him, and vice versa: she called her students "little shits," "little fuckers," "retards," and "stupid;" threw objects like shoes and cameras at them; passed gas and burped in their faces; physically harmed Alex's classmates in front of him by hitting, slap-

ping, pushing, and kicking them; and rubbed her breasts and buttocks in Alex's face and in the faces of his classmates while he was present. (*Id.* ¶¶ 63–65, 73–74.)

Boyd received specific reports that Alex was being abused in 2006, when Amanda Groover, a FCSD paraprofessional, informed Boyd that Pickens was "shoving and pushing and knocking Alex down on hard surfaces" and frequently removing Alex from the classroom. (*Id.* ¶ 109.) Other employees, including White, Tallant, Wade, and Wilson, all allegedly were made aware that Alex was being abused at some time in 2007. (Compl. ¶¶ 453, 498, 515–16, 530.)

The harm suffered by Alex as a result of Pickens' abuse was "severe" and "life long." (*Id.* ¶ 55.) He lost skills that he has yet to recover, regressed educationally and behaviorally, and now takes anxiety medication. (*See id.*) According to the Administrative Law Judge's Final Decision, Alex's ability to walk diminished, (Final Decision ¶ 45), his speech and language skills went in reverse, and he had increased difficulties with toileting. (*Id.* ¶ 52.) In 2010, three years after he was abused, Alex's behavior and affect took a serious downturn, and he was allegedly diagnosed with post-traumatic stress disorder. (*Id.* ¶ 57.) Alex was never able to tell his parents or others about his abuse or the harm he had suffered because of his disabilities.

### The May 2007 Investigation and Alleged Cover-up

As discussed above, Plaintiff alleges that at least 30 FCSD employees knew of Pickens' alleged abuse between 2004 and 2007, but no action was taken against Pickens until May of 2007. (Compl. ¶ 126.) That month, Hopewell Special Education teacher Susan Tallant found Alex's classmate Jake Marshall isolated and abandoned in a room on G–Hall, restrained to a chair and covered head to toe in feces. Tallant drafted a written statement about the incident and handed it to White, then the Hopewell

department head of special education, and Merritt. (Final Decision ¶ 36.) Tallant's report prompted an internal investigation by FCSD, which was conducted by an independent investigation agency, Business Decisions Information, Inc. ("BDI"). The BDI investigation "revealed the long history of abusive conduct by Pickens towards" a number of students, including Alex. (Final Decision ¶ 37.) The investigation also revealed that G–Hall and Hopewell staff were aware of the abuse, and reported it regularly to Boyd and other FCSD employees, but that Boyd refused to act on the reports. (*Id.*) The BDI investigator testified that the information uncovered was "almost 'unbelievable' " because of the egregiousness of the conduct involved. (*Id.*) Pickens resigned in May 2007. (Compl. ¶ 505.)

Although the 2007 investigation resulted in Pickens' resignation, many parents of her students, including Alex's, did not learn of Pickens' abuse until years later. No FCSD employee informed Alex's parents that Alex was being abused, even after the 2007 BDI investigative report. (*See, e.g.*, Compl. ¶¶ 316, 444, 457, 496, 498.) In fact, Alex's parents did not learn of the abuse until July of 2009, when they were contacted by Jake Marshall's parents. (Final Report ¶ 40 n. 17.)

Plaintiffs allege that this nondisclosure was because a number of FCSD employees participated in a plan to conceal the results of the investigation from parents and others. (Compl. ¶ 125.) FCSD officials, including the School Board president, Linda Schultz, conceded at Alex's due process hearing that parents should always be informed if their child was abused at school. (Final Decision ¶ 38.) But Plaintiffs allege that *no* FCSD employee informed Alex's parents of his abuse at the hands of Pickens. (*E.g.*, Compl. ¶ 163.) And Plaintiffs allege that some FCSD employees took

affirmative steps to actively hide or destroy evidence of the abuse.

For example, Wilson, the FCSD Superintendent from 2005 to 2008, learned of Pickens' abuse in 2007, but allegedly ensured that Alex's parents and the parents of other Hopewell students were not informed of the abusive conduct, and allegedly agreed, along with Ronnie Wade, the FCSD Chief Human Resources Officer, that "no criminal investigation would occur." (Compl. ¶¶ 527, 529.) And Cindy Kanner, a FCSD Human Resources Specialist, allegedly joined with Wade and Wilson and "alter[ed] government documents" and destroyed evidence to hide the abuse.[9] (Compl. ¶ 534.) And Young, a FCSD Human Resources Administrator who allegedly participated in the 2004 decision to predetermine the outcome of social worker Schuette's report, allegedly also declined to authorize an investigation into Pickens' abuse of other children even after the 2007 BDI report was completed. (Compl. ¶ 230.)

Lower level staff members were allegedly compliant in this post-abuse cover up too. Weinmann, the Hopewell IST, allegedly directed Hopewell teachers not to talk about Pickens and not to tell any of the children's parents of the abuse. She also later allegedly participated in a plan to retaliate against Tallant, the teacher who reported the May 2007 incident that led to the BDI investigation. (Compl. ¶¶ 510, 512.) Weinmann also allegedly had access to Pickens' and Merritt's emails, and after reading them, "deleted some or all of them." (Id. ¶ 512.)[10]

FCSD employees allegedly continued destroying evidence up until the date of Alex's due process hearing. Schuette, the FCSD social worker who conducted the 2004 investigation, was subpoenaed in advance of that hearing. (Compl. ¶ 358.) Instead of providing all documents relevant to that investigation, Schuette allegedly "cut and pasted a few parts of a few responsive emails and then deleted all of the [remaining] responsive emails from her computer." (Id.)

And Alex's parents continued having difficulties obtaining clarity from the District even after they learned of the abuse from another parent. Alex's mother described trying to get Alex's records from the school as a "nightmare." (Final Decision ¶ 62.) Basic information that Alex was allegedly clearly entitled to, like his speech therapy records and IEP data, were not produced to Alex's parents until his 2012 due process hearing was nearly over. (Id.)

Alex allegedly suffered greatly as a result of FCSD's failure to disclose the abuse in a timely manner. In 2006 and 2007, his parents were concerned about reports that Alex was becoming clumsy and falling down, but were "not aware at that time that his falls were often the result of being pushed by Pickens." (Final Decision ¶ 41.) As a result, they sought treatment for Alex. They consulted with an orthopedic surgeon, who gave Alex Botox injections in both hamstrings. These injections significantly weakened Alex, and he had to use a walker or wheelchair for nearly a year while he rebuilt his strength. (Id.) Alex also regressed in certain areas, like toileting (Id. ¶ 42), and in 2007 and 2008, he developed a "type of shyness that his family had never seen." (Id. ¶ 43.) He withdrew and stayed in his room more. (Id. ¶ 43.) Alex also showed regression in vocational skills, including maintaining his balance, in

---

9. The Final Decision found there was insufficient evidence to suggest that the investigative reports were actually altered. (Final Decision ¶ 37 n. 16.)

10. Notably, the Complaint concedes that Wilson, Wade, Kanner, and Weinmann may not have been aware of the abuse prior to the May 2007 incident and Pickens' resignation. (Compl. ¶ 177.)

2008 and 2009. (*Id.* ¶ 46.) Plaintiffs' expert witness at the due process hearing, Dr. Michael Mueller, concluded that "Alex's progress took a 'tremendous downturn' in the years after he was abused in Pickens' classroom," and that "this regression was seen across several areas, including speech and language and toileting." (*Id.* ¶ 52.)

**The District's Knowledge of the Abuse**

The Complaint also alleges that FCSD was aware of the abuse. First, School Board President Schultz testified that FCSD Board members were unaware of the abuse until after the BDI investigation. However, Pettes testified that the "School District was aware that Pickens was hurting children for many years and yet allowed her to remain as a teacher at Hopewell." (Final Decision ¶ 38.) Pettes also testified that the School District was aware that Alex in particular was being abused, because of the multitude of informal reports made during the 2006–07 school year. (*Id.*) Another teacher, White, told a Georgia Professional Standards Commission investigator that she had "never worked in a school where they basically looked the other way when a teacher was abusing .... students." (Compl. ¶ 449.)

And a significant number of senior FCSD officials were among the 30 FCSD employees who allegedly knew of Pickens' abuse, including at least two superintendents, two principals, two assistant principals, and higher-ups in the Human Resources department. (*Id.* ¶¶ 126, 210). None of them reported Pickens' abuse to other state authorities or the police, nor did they discipline Pickens in any way. (*E.g., Id.* ¶¶ 223, 225) ("[FCSD Human Re-

sources Administrator] Young decided in communications with [Superintendent] Vanairsdale, Denmark, Lynch, and Boyd that Pickens would not be fired, or put on an improvement plan" after receiving a November 2004 report indicating that Pickens was hitting her student, Jake Marshall, in the head repeatedly). In sum, the Complaint alleges that a FCSD teacher routinely abused special education students, that FCSD and dozens of its employees knew of the abuse, but that FCSD did little to nothing in response for at least three years.

**Educators' Duties to Report**

Finally—separate from the facts alleged by the Complaint—the Court offers a quick overview of the obligations of Georgia teachers and other school staff to report abuse. The responsibilities imposed by Georgia statutes and regulations are an important backdrop to this case.

The "mandatory reporter" statute, O.C.G.A. § 19–7–5, requires teachers and certain other school personnel to report child abuse.[11] The statute and its implementing regulations create an "up the ladder" system of reporting. If a person is required to report known or suspected abuse "pursuant to such person's duties as an employee of or volunteer at a hospital, school, social agency, or similar facility, that person shall notify the person in charge of the facility, or designated delegate thereof, and the person so notified shall report or cause a report to be made" to "a child welfare agency providing protective services ... or in the absence of such agency, to an appropriate police au-

---

11. The Court notes that this statute has been amended several times in the last few years, including most recently in 2015. The 2015 version of the statute appears to provide more clarity about what is required of educators when they believe someone *at their school* is abusing children, though it retains the "up the ladder" method of reporting. O.C.G.A.

§ 19–7–5 (2015). This may be because the statute defines some forms of abuse "physical injury or death inflicted upon a child by a parent or caretaker thereof"—which arguably does not apply to abuse by school staff (like, say, a janitor or bus driver) unless they are considered a "caretaker."

thority or district attorney." O.C.G.A. § 19–7–5(c)(2)–(e) (effective April 27, 2006 through May 4, 2009). "A staff member who makes a report to the person designated pursuant to [O.C.G.A. § 19–7–5(c)(2)] [is] deemed to have fully complied with [their obligation to report.]" O.C.G.A. § 19–7–5(c)(2). In other words, the original reporter does not have the duty to report the abuse directly to police or other state authorities under the statute. Failure to comply with the statute is a misdemeanor. O.C.G.A. § 19–7–5(h).

The implementing regulations for the mandatory reporter statute at the time were similar: they required abuse to be reported to the "school social worker or visiting teacher" or "another person designated by the local superintendent to receive such reports." Ga. Comp. R. & Regs. § 160–4–8.04(1)(c) (1990). The "designated person" is then required to report to the state Division of Family and Child Services and the school superintendent. *Id.* Again, the obligation to report goes up the chain of the command. Nothing in this portion of the regulations appears to require a reporter [12] to report abuse to an individual other than the social worker or other person designated by the local superintendent.

In addition, the Georgia Professional Standards Commission imposes an ethical obligation on certified educators to report known failures to report abuse. Ga. Comp. R. & Regs. § 505–6–.01 (2005). Failure to comply with the Commission's Code of Ethics does not, by itself, necessarily re-

sult in criminal liability. Instead, the culpable party may be reprimanded, suspended, or terminated by the local board (after an investigation). O.C.G.A. §§ 20–2–984.3–5. And none of the above regulations or statutes impose civil liability for a failure to report abuse.

## IV. DISCUSSION

With that background in place, the Court next turns to the Plaintiffs' claims. The Court first discusses whether FCSD may be liable for constitutional claims under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court then turns to Principal Boyd's liability, including her arguments that she is entitled to qualified immunity. Then, the Court addresses the substance of the constitutional claims, and whether they have been adequately alleged. The Court next turns to the issue of whether the individual defendants and Boyd are entitled to official immunity for all state law claims. Finally, the Court turns to the § 1983 conspiracy and supervisory liability claims.

### A. Fulton County School District's *Monell* Liability

Of the 23 counts alleged in the Second Amended Complaint, roughly a dozen of them are directed towards FCSD. Count 1, Plaintiffs' claim for attorney's fees under IDEA, is directed solely at FCSD, and FCSD does not move to dismiss this claim. FCSD does move to dismiss all remaining claims against it.[13]

---

12. Throughout the Order, the Court uses the term "reporter" to refer to an educator with a statutory or ethical obligation to report known or suspected child abuse.

13. These include counts 11 through 19, in which the Plaintiffs allege that FCSD, Ms. Pickens and Ms. Boyd are liable for federal and state constitutional violations arising out of Ms. Pickens' alleged misconduct, counts 20

and 21, in which Plaintiffs allege that FCSD and all other Defendants except Wilson, Wade, Kanner, and Wienmann are liable under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, and count 22, which alleges a conspiracy claim against FCSD. In this section, the Court considers only FCSD's motion to dismiss counts 11 through 19 (the constitutional claims).

FCSD argues first that Plaintiffs have failed to allege sufficient facts to support municipal liability under 42 U.S.C. § 1983 and *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). FCSD then argues that Plaintiffs have failed to allege facts to support their constitutional claims including their substantive due process claims, procedural due process claims, equal protection claims, and claims of cruel and unusual punishment, under both the United States and Georgia Constitutions.

### 1. *Monell* Liability Standard

■ Plaintiffs assert that FCSD "allowed, sanctioned, and covered up the abuse and abusive punishment of disabled children for at least five years." (Pls.' Resp. at 14 (Doc. 102.))[14] Plaintiffs advance two primary theories of municipal liability: either FCSD had a custom of inaction and indifference in responding to complaints of abuse against its students, or, in the alternative, that FCSD final policymakers made the decision that "Pickens would not be fired, would not be reported, and would not be stopped from abusing ... disabled children." (Pls.' Resp. at 15.) The Court first addresses liability under the "custom" theory.

■ Municipalities may be sued for "constitutional deprivations visited pursuant to governmental "custom" even though such custom has not received formal approval through the [municipality's] official decisionmaking channels." *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A custom is a "widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to [have] ... [the] force of law." *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (on summary judgment, evidence was sufficient to show custom of sexual harassment when municipality's workplace was "permeated with vulgar, demeaning, and sexually suggestive conversations about women, improper demands for sexual favors and dates ... and unfair treatment" of women).

■ In order to state a § 1983 claim against a school district for its "custom of inaction" in responding to complaints of abuse by employees, a plaintiff must plead: (1) the existence of a persistent pattern of abuse by school employees that (2) was known about by the school district (3) who then tacitly approved or deliberately ignored the abuse, such that their inaction can be said to be a custom of deliberate indifference to abuse and (4) this custom of deliberate indifference was a "moving force" behind the violation of the constitutional rights. *See Hackett v. Fulton County School Dist.*, 238 F.Supp.2d 1330, 1365 (N.D.Ga.2002). The Court addresses each element in turn.

### a. Custom: Persistent Pattern of Abuse

■ Plaintiffs must first allege that there was a persistent pattern of abuse, because an isolated incident of wrongdoing is insufficient to establish a custom of ignoring such wrongdoing. *McDowell v.*

---

14. Plaintiffs also make gestures toward asserting a "failure to train" theory of municipal liability. (Pls.' Resp. at 14 ("[A] government entity may be liable for failure to train, supervise, or discipline its employees, and all of that applies in this case.")) The Court notes that the Complaint does not plead facts that suggest such a theory of municipal liability is viable. In fact, the Complaint suggests that many of the individual defendants knew they should report Pickens' abuse, but deliberately decided not to, and that Pickens received training, but willfully disregarded it. This suggests a custom of deliberate indifference to reports of abuse, not that staff members were not properly trained. Accordingly, Plaintiffs are not permitted to proceed on a failure to train theory of liability.

*Brown*, 392 F.3d 1283, 1290–91 (11th Cir. 2004) (finding no basis for *Monell* liability where inmate could not point to more than one incident where jail's alleged understaffing led to an inability to transport an inmate in need of medical attention).

There is no bright line identifying when misconduct transforms from a couple of "isolated instances" into a pattern of abuse. *Doe v. School Board of Broward County, Fla.*, 604 F.3d 1248, 1266 (11th Cir.2010) (two instances of sexual harassment or abuse did not establish custom of inaction, but contrasting case with *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir.2006), where evidence that prison received "at least thirteen complaints and inquiries" regarding alleged prisoner abuse created fact question of whether or not prison had custom of ignoring complaints). One or two incidents of abuse is generally insufficient to indicate a pattern. But on a motion to dismiss, allegations of anything more than that are generally sufficient, even if the acts were committed by one employee. *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 728–29 (3rd Cir.1989) (five complaints of sexual abuse by two teachers over four years sufficient to establish custom of inaction); *J.V. ex rel. Ortiz v. Seminole County School Bd.*, No. 04–cv–1889, 2005 WL 1243756 at *3 (M.D.Fla. May 25, 2005) (denying dismissal when school board had knowledge of a single teacher's repeated acts of abuse and still tried to transfer her; if proven, such allegations would "establish tacit authorization" by district).

Here, Plaintiffs allege a multi-year pattern of abuse by Pickens against several special education students, spanning from at least 2004 through 2007, and resulting in at least 10 reports of abuse to Principal Boyd, 8 reports to Merritt, and a number of other reports to senior FCSD officials. (*E.g.*, Compl. ¶ 28, 113.) This is more than adequate to establish a pattern of abuse. *See Valdes*, 450 F.3d at 1244 (prison received 13 complaints about prisoner abuse); *Stoneking*, 882 F.2d at 720 (school received 5 complaints of abuse over 2 years).

#### b. FCSD's Knowledge

The school district or school board must also know about the persistent abuse that led to the alleged constitutional violations in order to impose *Monell* liability. That knowledge may come from actual notice, or may be imputed via constructive notice under some circumstances through notice to an appropriate senior official. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("[i]t would ... be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware"); *Young v. City of Augusta, Ga. Through DeVaney*, 59 F.3d 1160, 1173 (11th Cir.1995) ("[c]ity policymakers should have been aware" of a "pattern of deliberate indifference to the psychiatric needs of mentally ill inmates" at a city jail); *Hackett*, 238 F.Supp.2d at 1365.

Plaintiffs allege that FCSD itself was aware of Pickens' abuse. Importantly, Plaintiffs attach a copy of the Final Decision, which memorializes testimony from a senior FCSD employee who confirmed that FCSD knew Pickens was harming children "for many years." (Compl., Ex. B at ¶ 38 ("Pettes, the School District's Special Education Coordinator, agreed that the School District was aware that Pickens was hurting children for many years and yet allowed her to remain as a teacher at Hopewell.") At the motion to dismiss stage, this is sufficient to infer that FCSD actually knew about the abuse.

Even if that allegation was not enough, Plaintiffs have alleged that FCSD superintendents had knowledge of the

abuse and that this provided FCSD with constructive notice of Pickens' abuse. This is also sufficient at the motion to dismiss stage, because an allegation that a superintendent, board member, or other senior official had knowledge of the alleged misconduct is enough to infer that the district itself had notice. *See Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir.1985) (reversing district court's dismissal when complaint alleged a custom of allowing the use of excessive force, and further alleged the mayor and city's public safety director were aware of such conduct); *Brown v. City of Fort Lauderdale*, 923 F.2d at 1481 (11th Cir.1991) (reversing grant of dismissal when plaintiff alleged that police department engaged in custom of racially discriminatory practices and police chief knew about such practices); *Dipippa v. Union School Dist.*, 819 F.Supp.2d 435, 443 (W.D.Pa.2011) (denying motion to dismiss in § 1983 suit alleging that a student was sexually assaulted by a teacher, when complaint pled a "custom, practice, and/or policy of deliberate indifference to and/or concealment of instances of known and improper contacts and relationships" between a teacher and a student, "by way of specific actions, or inactions, taken by the District superintendent ... the high school principal ... and the athletic director for the high school").

Here, the Complaint pleads that over thirty (30) FCSD employees were aware of the abuse. (Compl. ¶¶ 113, 126, 304.) Among those employees were a superintendent and multiple principals and assistant principals. (*See, e.g.*, Compl. ¶ 223.) This too is sufficient as a whole to infer that FCSD "must have known" about the abuse. *Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915.

#### c. Deliberate Indifference

Assuming a school district knows or should know about a pattern of abuse by an employee, it must also tacitly approve of the custom or be "deliberately indifferent" towards it. *See Griffin*, 261 F.3d at 1308 (testimony to jury established "that the final policymakers ... were aware of the [sexual harassment] problem and were completely indifferent to it"); *see also Hackett v. Fulton County School Dist.*, 238 F.Supp.2d 1330, 1347, 1365 (N.D.Ga.2002) (granting summary judgment to defendant when school district immediately removed teacher upon receiving notice of alleged abuse and when superintendent never received any reports of alleged sexual misconduct by teacher).

 Deliberate indifference requires "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir.2013). Deliberate indifference may be shown by a lack of appropriate action in the face of a pattern of similar constitutional violations, because a lack of action suggests tacit authorization or ratification. "In other words, a long-standing and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir.1991); *Fundiller*, 777 F.2d at 1443 (reversing dismissal where "persistent failure to take disciplinary action against [a subordinate]" supported "the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell*").

 Here, the Complaint alleges that despite widespread actual knowledge of Pickens' pattern of abuse, Principal Boyd, FCSD superintendents, senior Human Resources officials and others failed to intervene, discipline Pickens, report the abuse to the appropriate authorities, or notify parents. (*E.g.*, Compl. ¶¶ 108–15, 223) ("Young decided in communications with

Vanairsdale, Denmark, Lynch, and Boyd that Pickens would not be ... put on an improvement plan, written up, ... reported to DFACS or the police or other authorities for hitting Jake Marshall in the head hard frequently, calling him vile names, spraying Lysol on a child numerous times, and restraining a disabled child's arm to a chair.") The Complaint further alleges that Superintendent Vanairsdale and others became involved in a FCSD social work department investigation of Pickens at the request of Boyd, and that together the Superintendent, Principal Boyd, and several other FCSD officials predetermined the outcome of that investigation, and decided that Pickens would not be reported. (Compl. ¶¶ 224, 246.) This, Plaintiffs allege, "empowered" Boyd to continue her course of conduct of non-reporting. (Compl. ¶ 249.)

Taken together, an inference can be drawn that FCSD had notice of Pickens' alleged abuse, knew that it had persisted for some time, knew that the abuse had been perpetrated against multiple students, and still failed to intervene at all. This is sufficient to allege a custom of "obvious, deliberate indifference to [ ] abuse." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 508 (6th Cir.1996).

### d. Moving Force

▮▮▮▮ Finally, the custom must be the moving force behind the alleged constitutional violation. *Hackett*, 238 F.Supp.2d at 1365. In other words, the custom of indifference to abuse must have a substantial causal relationship to the alleged harm suffered by the Plaintiff. Here, Plaintiffs allege that FCSD was aware of Pickens' abuse of disabled students for at least three years before Alex was abused, but did nothing in response—and in fact, squashed the possibility that a 2004 social worker's report would lead to a recommendation that Pickens be reported. This is sufficient to suggest that FCSD's "custom

of inaction" and "deliberate indifference" lasted for three years, and FCSD's failure to take any action that might stop Pickens' pattern of abuse resulted in the specific abuse. *Doe v. Faerber*, 446 F.Supp.2d 1311, 1317 (M.D.Fla.2006) (denying dismissal when student alleged that school board member had sexually abused him and that school board had "longstanding practice and custom to avoid and ignore complaints and incidents of sexual abuse of children, particularly when such abuse is perpetrated with power and influence in the School Board"). Thus the Complaint fairly alleges that FCSD's actions caused Alex's abuse and, as a result, caused the underlying constitutional violations. As a result, Plaintiffs have pled sufficient facts to support their *Monell* theory of liability against FCSD.

### 2. Final Policymaker Theory of Liability

▮▮▮▮ Plaintiffs also argue that FCSD may be held liable under a final policymaker theory of liability. The final policymaker theory of liability provides a method for establishing local governmental liability where an individual vested with ultimate, non-reviewable decision-making authority for the challenged action or policy has approved or implemented the unconstitutional action at issue. *Scala v. Winter Park*, 116 F.3d 1396, 1398–1403 (11th Cir.1997). "To determine if someone is a final policy maker, [courts] look not only to 'state and local positive law,' but also 'custom and usage having the force of law.'" *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir.2004)

▮▮▮▮ Here, Plaintiffs argue that several FCSD senior officials, including two superintendents, made express decisions to retain Pickens despite evidence that she was abusing children and covered up the evidence of that abuse. (Pls.' Resp. at 15.)

Defendants respond by arguing that no individuals named in the Complaint "were final policymakers with respect to personnel decisions affecting teachers," and that instead that power is solely vested with "local boards of education, not local school administrators." (FCSD's Reply, Doc. 111 at 7, citing O.C.G.A. §§ 20–2–940–942.) For the following reasons, the Court concludes that preventing Plaintiffs from proceeding under this theory of *Monell* liability would be unwise at this juncture.

First, Plaintiffs need not identify who precisely was the final policymaker in their Complaint, because that inquiry is "fact sensitive" and requires development of the record. *Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir.2016) ("We therefore believe that identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement.'") The question of who has final policymaking authority in the context of the facts of this case is thus much more appropriately resolved at summary judgment, not at the pleading stage. This alone is enough to counsel against dismissal, and the following discussion illustrates why.

Some of the individuals named in the Complaint undoubtedly had an extremely important role in the decision to retain Pickens, and thus, depending on the facts, may have acted as "final policymakers" with respect to the decision to not terminate or discipline her. The Court takes Superintendents Vanairsdale and Wilson as two examples.

■■■ The school superintendent is the "executive officer" of the local school board, and thus charged with carrying out its policies. Ga. Const., Art. VIII, § 5, ¶ iii. While Defendants are correct that the school board technically retains the power to hire and fire educators, *see* Ga. Const., Art. VIII, § 5, ¶ ii; O.C.G.A. § 20–2–940,

the superintendent has a predominant role in this process.

First, the superintendent often functions as a gatekeeper and veto-holder over personnel decisions, because "[a]ll teachers, principals, other certificated professional personnel, and other personnel of a local unit of administration shall be employed and assigned by its governing board on the recommendation of its executive officer." O.C.G.A. § 20–2–211 (2009). Moreover, a superintendent does have the power and discretion to relieve teachers from duty temporarily under sufficiently serious circumstances. O.C.G.A. § 20–2–940(g). And the superintendent may issue a formal letter of reprimand to a teacher (which the teacher may appeal to the school board). O.C.G.A. § 20–2–944. These statutes demonstrate the obviously important role superintendents play in personnel matters.

This is congruent with the case law, which consistently shows that local boards often defer, as a matter of policy and practice, to the judgment of superintendents regarding hiring and firing matters. *See, e.g., Doherty v. Wilson*, 356 F.Supp. 35, 37 (M.D.Ga.1973) (finding, after an evidentiary hearing, that a Georgia "board's general practice has been to defer to the judgment of the superintendent regarding the hiring of teachers"); *Tripp v. Martin*, 210 Ga. 284, 79 S.E.2d 521, 523 (1954) (describing the crucial role of the superintendent in hiring matters under an earlier state statute, and stating "[t]he language of this [statutory] section, '*shall be elected by the boards of education on the recommendation of the respective superintendents*', is mandatory and not directive") (emphasis supplied).

Similarly, although the school board is responsible for crafting and implementing policies concerning the reporting of child abuse, the superintendent plays a significant role here too. Ga. Comp. R. & Regs.

§ 160–4 8–.04 (1990). As noted above, he or she is the executive officer in charge of implementing the policy. Ga. Const., Art. VIII, § 5, ¶ II. And he or she is responsible for designating an individual at each school who is responsible for receiving reports of child abuse and then transmitting them onward to appropriate authorities. Ga. Comp. R. & Regs. § 160–4 8–.04 (1990).

■■■ Finally the Court takes notice based upon its experience that the normal policy and practice in Georgia is for school boards to consider and hold hearings regarding the hiring and firing of personnel based upon the recommendation of the superintendent, even if, as a technical matter, the board retains the constitutional authority to independently initiate the hiring and firing of personnel.[15]

Thus Georgia's statutes and regulations, and the Court's own experience, suggests that superintendents may serve, depending on the factual circumstances, as final policymakers with respect to reporting policies for child abuse and the hiring and firing of teachers who allegedly abuse students.[16] While the Court has found little in the way of Eleventh Circuit law addressing whether or not a Georgia superintendent or other official is a final policymaker with respect to these discrete issues, it has found analogous cases that make clear that (1) such a determination tends to depend on the evidence in the record but (2) it is definitely *possible* that a superintendent may hold final policymaking authority under some circumstances.

First, the Eleventh Circuit has held that a Georgia superintendent is a "policymaker" in a related context. In *Leslie v. Hancock Cty. Bd. of Educ.*, a superintendent sued the school board that terminated her after she spoke out about local tax policy. 720 F.3d 1338, 1349 (11th Cir.2013). The Eleventh Circuit found the board had qualified immunity because it was not clearly established that a "policymaking or confidential employee" who speaks about policy can prevail under the First Amendment balancing test applied to state employees who speak about matters of public concern outlined in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

To reach its decision in *Leslie*, the Eleventh Circuit held that a "local school superintendent under Georgia law is a policymaking or confidential employee for the purpose of a First Amendment retaliation claim under § 1983, because in Georgia, the superintendent acts as "the alter ego of her employer [the board]." 720 F.3d at 1349. The Court noted that the local school board relies on superintendents to "not only enter transactions on behalf of the Board, but also to enforce its policies." *Id.* at 1351. While *Leslie* is not precisely on point because it did not address *Monell* liability, it illustrates how the Eleventh Circuit has construed a Georgia superintendent's duties.

Second, the Eleventh Circuit has found principals can act as final policymakers for the purposes of *Monell* liability with respect to student discipline issues. In *Hollo-*

---

**15.** The Court also takes notice that principals have the power to recommend to the superintendent whether a teacher should be retained or not. *Baker v. McIntosh Cty. Sch. Dist.*, 264 Ga.App. 509, 591 S.E.2d 362, 363 (2003) (principal recommended to superintendent non-renewal of non-tenured teacher's contract and gave that teacher a written notifica-

tion letter; this was sufficient notice of non-renewal under O.C.G.A. § 20–2–211(b)).

**16.** FCSD school board policies, procedures, and customs no doubt will bear relevance on these questions, but they are not currently before the Court.

*man*, the Eleventh Circuit found that a principal was a final policymaker with respect to corporal punishment, because his decision to impose such punishment on a student was not subject to meaningful board review and because the school district's student handbook acted as a "delegation to [the principal] of final decision-making authority regarding the administration of corporal punishment." 370 F.3d at 1293. While the court noted that this did not mean that the principal always acted as a final policymaker, the specific circumstances of that case demonstrated that his decision to paddle a student was functionally unreviewable. *See id.* at 1293–94.

The message from these cases is plain: determining who is a final policymaker is a question of law, but it depends intensely on the facts of the case, and requires consideration of both positive law and local custom. And non-school board officials can, under certain circumstances, be considered final policymakers. *Holloman*, 370 F.3d at 1293. This is likely especially true with superintendents, who act as "executive officers" and are the "alter ego" of the board, responsible for carrying out its policies. *Leslie*, 720 F.3d at 1349. These individuals, as discussed above, often serve as gatekeepers over personnel decisions. Thus, under specific factual circumstances, they may possess functionally unreviewable authority to retain problematic teachers by not recommending their termination to the board. *See Holloman*, 370 F.3d at 1293 (principal had functionally unreviewable authority to corporeally punish student).

The Court therefore cannot say at this juncture that one of the superintendents (or some other appropriate official) who was aware of the abuse unquestionably lacked "final policymaking authority" with respect to disciplining or firing Pickens or

ensuring that she was reported, or whether they exercised that authority on behalf of the board as a matter of school board policy, or custom. Plaintiffs may therefore proceed against FCSD under this theory of *Monell* liability.

## B. Defendant Boyd's Liability

The Court next addresses whether Plaintiffs may sue Principal Boyd under § 1983 for the abuse suffered by Alex.[17]

### 1. Principal Boyd's Supervisory Liability Under § 1983

Although Plaintiffs name Principal Boyd directly in the constitutional counts (numbers 11 through 19), it appears they proceed under a theory of supervisory liability. (Pls.' Resp. to Boyd's Motion to Dismiss, Doc. 109 at 11) ("Boyd has supervisory liability.")

 Supervisory officials can be held liable under § 1983 actions for constitutional violations on two grounds: "(1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Gray v. Bostic*, 458 F.3d 1295, 1308 (11th Cir.2006). Plaintiffs' Complaint does not allege that Principal Boyd or any other Defendants personally participated in the abuse, and so they must allege sufficient facts to infer that there was a causal connection between Boyd's actions as a supervisor and the alleged constitutional violations.

 A causal connection can be established in one of two ways: "(1) when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so or (2) when a supervi-

17. The Court addresses the Section 504, ADA, and state law claims against Principal Boyd in the sections specifically dealing with those claims below.

sor's improper custom or policy results in deliberate indifference to constitutional rights." *Doe v. School Bd. of Broward Cty. Fla.*, 604 F.3d 1248, 1266 (11th Cir.2010) (quotation marks omitted); *D.H. ex rel. Dawson v. Clayton Cty. Sch. Dist.*, 904 F.Supp.2d 1301, 1311 (N.D.Ga.2012).[18] Here, the Complaint advances both theories.

First, the Complaint alleges facts that support the inference that Boyd was aware of a history of widespread abuse and failed to correct it. Much like *Monell* liability, "a history of abuse ... must be 'obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences' " to put a supervisor on notice that it must be corrected. *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d at 1266 (citations omitted). Here, Plaintiffs have alleged that Boyd received at least ten reports of Pickens' abuse from at least eight individuals. (Compl. ¶ 264.) Some of those individuals reported abuse "multiple times." (Compl. ¶ 264.) And the Complaint alleges that Boyd not only took virtually *no* action to stop Pickens, it also alleges that Boyd actually shielded Pickens from any consequences for her actions by intimidating teachers who reported abuse. This included Boyd telling a school nurse that she was unhappy that the nurse had reported Pickens, informing Pickens when individuals reported her, and intimidating a janitor who reported Pickens by upbraiding him and contacting his supervisor. (Compl. ¶¶ 271–76.) This is more than enough to allege a "history of widespread abuse" that a supervisor failed to correct.

The Complaint also alleges that Boyd employed a custom of deliberate indifference. A defendant is "not deliberately indifferent simply because the measures [she] takes are ultimately ineffective in

stopping a teacher from harassing" or abusing students. *Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir.2005); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 458 (5th Cir.1994) (granting summary judgment to superintendent who responded to reports of teacher abusing students by conducting investigations; the fact that those investigations were ineffective did not mean he was deliberately indifferent). However, a principal who fails to appropriately respond to repeated reports of a subordinate's abuse of students may, depending on the facts of the case, be said to act with deliberate indifference. *Baynard v. Lawson*, 112 F.Supp.2d 524, 530 (E.D.Va.2000), *aff'd sub nom. Baynard v. Malone*, 268 F.3d 228 (4th Cir.2001) (upholding § 1983 jury verdict against principal because after she received a report that teacher had abused a student fifteen years earlier and was a pedophile, she failed to report a lap-sitting incident with the same teacher, and did not alter her practices to increase monitoring of suspected teacher, despite express instructions to do so from a school administrator); *Doe v. Bd. of Educ. of Consol. Sch. Dist. 230 Cook Cty., Ill.*, 18 F.Supp.2d 954, 958 (N.D.Ill.1998) (denying summary judgment in a school abuse case for principal/assistant superintendent, band director, and a handful of other defendants because there was sufficient evidence that suggested that some defendants may have "turned a blind eye" to teacher's abuses).

Here, Plaintiffs allege that Boyd engaged in a pattern of intimidation and dismissiveness towards teachers who reported Pickens' conduct. (Compl. ¶¶ 271–76; Compl. Ex. B, Final Decision ¶ 27 (Boyd created "an atmosphere of intimidation" at the school).) These alleged facts, if true, suggest that Boyd knew Pickens

18. "The 'situation of municipal liability' is "analogous" to the question of supervisorial liability." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir.2004).

was harming disabled students for three years and did nothing about it—or worse, took actions that may have condoned or encouraged it. (*See ids.*) Accordingly, Plaintiffs have stated a claim for supervisory liability against Boyd.

### 2. Qualified Immunity

Next, the Court addresses Boyd's claim of qualified immunity. Boyd argues broadly that she has qualified immunity with respect to the constitutional claims. But she offers little in the way of case law or analysis to suggest why that is so as a facial matter at this early stage of the proceedings.

 "[P]ublic officials sued in their individual capacities are entitled to qualified immunity when their actions do not violate 'clearly established statutory or constitutional rights.'" *Tapley v. Collins*, 211 F.3d 1210 (11th Cir.2000). "Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from suit unless the official's conduct violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir.2010) (internal quotation marks and brackets omitted). Plaintiffs can only overcome the qualified immunity defense by showing that (1) a defendant's conduct violated a constitutional right and (2) this right was "clearly established at the time of the violation." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir.2010).

 It has been clearly established for decades that the violations Plaintiffs complain of—excessively severe corporal punishment, discrimination against disabled students without a rational basis, and deprivation of a student's right to his state-created property interest in his education without due process—are unconstitutional. *E.g.*, *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069 (11th Cir.2000) (substantive due process); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (equal protection). And it has also been long-established that a supervisor may bear responsibility for her subordinate's unconstitutional acts if she acts with deliberate indifference in response. *See Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir.2015) (there is a "clearly established principle that deliberate indifference to sexual harassment is an equal protection violation.")

The Complaint, which alleges a multi-year reign of terror by Pickens against her disabled students, and a totally impotent and improper response by Principal Boyd and others, sufficiently alleges "clearly established" violations of the Constitution. Whether or not those allegations are substantiated is another issue for another time. But if Plaintiffs' allegations are true, they have pled enough facts to overcome an immunity defense. Dismissal based on qualified immunity is therefore inappropriate at this stage—at least not without allowing plaintiffs more time to develop their claims. *Harper v. Lawrence County, Ala.*, 592 F.3d 1227, 1237 (11th Cir.2010) (affirming district court's order denying motion to dismiss supervisory liability claims over the qualified immunity objections of several defendant state officials). The Court notes that Boyd's qualified immunity claims were rejected in her motion to dismiss in a companion case. *Persadi v. The Fulton County School District, et. al*, No. 1:12–CV–4072–TWT, Doc. 34 (N.D.Ga. Sept. 23, 2012).

### C. Fourth Amendment Unreasonable Seizure Claims

██ The Court next turns to the substance of Plaintiffs' claims. The Court first addresses Boyd's argument that Plaintiffs' Fourth Amendment claim should be dis-

missed.[19] This claim appears remarkably similar to Plaintiffs' Fourteenth Amendment claims. Plaintiffs' Fourth Amendment claim (Count 11) alleges that Pickens, Boyd, and FCSD denied Alex of his right to be "free from excessive force and unreasonable restraint and mistreatment," and re-alleges some of the specific abuses Alex suffered. (Compl. ¶¶ 109, 119.) The Count continues by alleging that Alex had the right to be free from "intentional[ ] abuse and harm and excessive[ ] and unduly severe[ ] physical[ ] punish[ment]." (*Id.* ¶ 116.)

The Eleventh Circuit appears to view claims of abuse in the school setting solely through the lens of the Fourteenth Amendment. *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.*, 229 F.3d 1069, 1075 (11th Cir.2000) ("excessive corporal punishment may in certain circumstances state a claim under the substantive Due Process Clause" of the Fourteenth Amendment); *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 598 (11th Cir. 2010) (analyzing excessive corporal punishment claim under Fourteenth Amendment).

 Plaintiffs cite only out-of-circuit authority for the proposition that the Fourth Amendment is the appropriate vehicle to assess the consequences of a teacher's force against a student. (Doc. 109 at 13.) Because the Eleventh Circuit appears to continue to apply the Fourth Amendment to claims concerning abuse or excessive corporal punishment by school officials, dismissal is appropriate. If Plaintiffs' Fourth Amendment Claim and their theory of a "seizure" were more readily separable from their substantive and procedural due process claims, there might be

a different result. The Court therefore **DISMISSES** Plaintiffs' Fourth Amendment Claim against all Defendants.

### D. Procedural Due Process Claims

Plaintiffs next allege that Pickens violated Alex's constitutional due process rights because she frequently pulled him from the classroom and isolated him alone in a room strapped to a chair for "hours at a time" without notice or a hearing, and because she failed to follow the proper procedures mandated by Georgia law prior to administering corporal punishment.

 To state a procedural due process claim, Plaintiffs must allege facts showing (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir.2003).

 Plaintiffs' theory of liability here is a bit jumbled. On the one hand, they argue that Pickens' failure to follow two state statutes requiring written notice before "removal" of a student from the classroom are the genesis of their due process claims. On the other hand, they acknowledge that the "procedural safeguards are not the property interest but instead the property interest is education." (Pls.' Resp. at 31.) Plaintiffs' latter statement is correct; "the Eleventh Circuit has "emphasize[d] that the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution." *Long v. Fulton Cty. Sch. Dist.*, 807 F.Supp.2d 1274, 1289 (N.D.Ga.2011) (citing *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 (11th Cir.1987). However, students

---

**19.** FCSD and the Individual Defendants do not specifically address the Fourth Amendment claim in their Motion. However, as the Court finds that the Fourth Amendment claim is duplicative of the Fourteenth Amendment due process claims for the reasons stated herein, the Court dismisses the Fourth Amendment claims against FCSD and the remaining Individual Defendants too.

who are entitled to a free public education under state law do have a property interest in attending school. *Roy ex rel. Roy v. Fulton Cty. Sch. Dist.*, 509 F.Supp.2d 1316, 1323 (N.D.Ga.2007) (citing *Goss v. Lopez*, 419 U.S. 565, 572–73, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The question then is whether Alex was "removed" from school so as to trigger the requirements of procedural due process.

### 1. Removal from the Classroom

██ A student only suffers a deprivation of his procedural due process rights due to a removal from the classroom if that removal can be fairly characterized as a "total exclusion from the educational process." *Goss*, 419 U.S. at 576, 95 S.Ct. 729.

██ Removals that do not "totally deprive" a student of their right to attend school do not result in procedural due process violations because there "is, of course, a *de minimis* level of imposition with which the [Fourteenth Amendment] is not concerned." *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). For example, Courts have consistently held that short-term in-school suspensions or timeouts do not lead to procedural due process claims. *Laney v. Farley*, 501 F.3d 577, 582 (6th Cir.2007) (in-school suspensions that result in a student's removal from the classroom do not "implicate a student's property interest in a public education). And even repeated removals over the course of weeks and months do not trigger the due process clause's protection. *Couture v. Board of Educ. of Albuquerque Public Schools*, 535 F.3d 1243, 1256–57 (10th Cir.2008) (removal of disabled student from classroom "approximately twenty-one times for a total of twelve hours" over roughly two months was *de minimis* deprivation of rights that did not implicate procedural due process, even when student was not permitted to go to restroom); *Dickens v. Johnson County*

*Bd. of Educ.*, 661 F.Supp. 155, 158 (E.D.Tenn.1987) (cited approvingly by *Laney* and holding that student's property interest in education was not implicated when he was placed in a timeout in a cardboard box for as long as four and a half hours on six consecutive days); *Jones v. Long County School Dist.*, No. 211–005–LGW, 2012 WL 3562300 at *5 (S.D.Ga. Aug. 14, 2012) (noting that in-school suspensions generally do not implicate procedural due process rights because *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) holds that such rights are triggered only by a "total exclusion" from the school environment).

Many of these same courts have often noted that "under certain circumstances, in-school isolation could well constitute as much deprivation of education as at-home suspension," depending "on the extent to which the student was deprived of instruction or the opportunity to learn." *Laney*, 501 F.3d at 581–82. The *Couture* court noted that "[a]t some point, punishment timeouts used excessively might become the functional equivalent of [an] out-of-school suspension." 535 F.3d at 1257; *see also Orange v. County of Grundy*, 950 F.Supp. 1365, 1372–73 (E.D.Tenn.1996) (use "of isolation as a form of punishment . . . [by placing students] in text book storage rooms" for a full day without access to food or toilet facilities could implicate both substantive and procedural due process rights).

██ Here, Plaintiffs allege a pattern of repeated in-school isolation that may suggest that Alex was functionally "totally excluded" from the education process. *Goss*, 419 U.S. at 576, 95 S.Ct. 729. Specifically, Plaintiffs allege that Pickens restrained "Alex on multiple occasions to a Rifton toilet chair and abandoned him in a closet-like room that had a toilet, many times with the door shut and the lights

out." (Compl. ¶¶ 41, 79 (stating that Pickens abandoned Alex "in a room on multiple occasions, sometimes up to hours at a time"). Pickens did this, according to the Complaint, for "30 minutes to hours at a time." (Compl. ¶ 42.) The Complaint does not specify exactly how often this isolation occurred. Instead, it alleges that he was "repeatedly" removed from the classroom "over and over" again. (Compl. ¶ 132.)[20] And the Complaint alleges that Alex suffered "muscle atrophy" as a result of this abandonment and still has a fear of dark or dimly lit rooms as a result. (Compl. ¶ 95.) These facts—just barely—plausibly allege that Alex was submitted to enough lengthy timeouts that he was "functionally" totally removed from the school environment without due process. And Plaintiff alleges that they received *no* notice or opportunity to be heard prior to (or after) any of these removals.[21]

Thus, the Court **DENIES** the Defendants' Motion to Dismiss Plaintiffs' procedural due process claims with respect to the alleged timeouts. If it turns out that these removals were not so frequent and pervasive as to be fairly characterized as the "functional equivalent" of a lengthy out-of-school suspension, then they will be dismissed. Plaintiffs should be mindful that other courts have, even in recent years, found that disabled students who were subjected to dozens of timeouts over the span of several months were still unsuccessful on their procedural due process claims at the summary judgment stage.

### 2. Corporal Punishment

▮▮▮ Plaintiffs are not, however, permitted to proceed on their second theory for their procedural due process claims, that Defendants violated Alex's procedural due process rights by failing to follow proper procedures before administering corporal punishment. Supreme Court precedent is clear that "the Due Process Clause does not require notice and a hearing prior to the imposition of corporal punishment," no matter how severe. *Ingraham*, 430 U.S. at 682, 97 S.Ct. 1401. This is true even with respect to unjustified punishment, because "the available civil and criminal sanctions for abuse considered in light of the openness[22] of the school environment afford significant protection against unjustified corporal punishment." *Id.* at 678, 97 S.Ct. 1401. Were this or any other Court to impose procedural requirements on the imposition of corporal punishment, it would be quickly faced with the "impracticability of formulating a rule of procedural due process that varies with the severity of the particular imposition" and would "significantly burden the use of corporal punishment as a disciplinary measure." *Id.* at 681, 97 S.Ct. 1401. As a result, courts in this circuit have repeatedly dismissed or granted summary judgment against due process claims founded on allegations that corporal punishment procedures were not followed. *Nowell v. Dale County Bd. of Educ.*, 17 F.Supp.3d 1134, 1138 (M.D.Ala.2014) (dismissing procedural due process claims where plaintiff

---

**20.** The Court notes that the Final Decision documents three instances of when Alex was removed and left alone outside the classroom in a dark windowless room. (Final Decision ¶ 34) (isolation occurred "on at least three occasions during the 2006–07 school year.)

**21.** The Court does not find that the alleged violations of O.C.G.A. §§ 20–2–737 and 738 trigger procedural due process rights on their own. It seems obvious to the Court that each

and every half-hour timeout is not a "removal from the classroom" for the purposes of due process.

**22.** In recent years the "openness" of schools has perhaps become debatable. *See, e.g., Jordan v. Randolph Cty. Sch.*, No. 4:08–CV–131–CDL, 2009 WL 1410082, at *7 (M.D.Ga. May 19, 2009) (alleged cover up of student-on-student sexual abuse).

alleged that his corporal punishment was not carried out in conformance with school board policy); *Hale v. Pringle*, 562 F.Supp. 598, 601 (M.D.Ala.1983) (holding a student's right to procedural due process was not violated even though the principal failed to adhere to the school policy). The Court therefore **DISMISSES** the portion of Counts 12 and 13 that rely upon the alleged failure to follow proper corporal punishment procedures.

### E. Substantive Due Process Claims

Defendants also move to dismiss Plaintiffs' substantive due process claims under the Federal and Georgia constitutions for excessive corporal punishment.

■ Excessive corporal punishment is actionable under the substantive component of the due process clause. *See Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069 (11th Cir.2000); *Kirkland ex rel. Jones v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903 (11th Cir.2003); *Hatfield v. O'Neill*, 534 Fed.Appx. 838 (11th Cir.2013). To state a substantive due process claim, the student's allegations of excessive corporal punishment must "rise to the level of arbitrary and conscience-shocking behavior." *Neal*, 229 F.3d at 1075.

■ "Excessive corporal punishment claims have an objective and a subjective component, both of which must be met before a school official may be subject to liability." *Id.* at 1075 n. 3. The objective component requires a court to consider the "totality of the circumstances" in determining "whether the amount of force used is obviously excessive." *Id.* at 1075. *Neal* identifies a number of factors that courts must consider: (1) the need to apply corpo-

ral punishment to the student; (2) the relationship between the need for punishment and the amount of punishment administered; (3) the extent of the injury inflicted, and (4) whether or not a student is disabled. *Id.*; *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 600 (11th Cir.2010).

■ The subjective component focuses on whether the teacher *intended* to cause harm. *Neal*, 229 F.3d at 1075 n. 3. In particular, the court examines whether the teacher's conduct creates an inference of subjective malice. *Hatfield*, 534 Fed.Appx. at 847. However, the Eleventh Circuit has noted, "if the use of force was objectively reasonable—that is, if it 'was not excessive as a matter of law and was a reasonable response to the student's misconduct'— then the subjective intent of the school official is unimportant." *T.W.*, 610 F.3d 588 at 600.

#### 1. Objective Component

■ Plaintiffs have alleged facts that satisfy the objective component of the *Neal* test. They allege a year-long pattern of abuse where Pickens pushed Alex down multiple times on cement, jerked him down by grabbing his body, and threw a book bag and other objects at him, which resulted in scrapes and bruises. (Compl. ¶¶ 28–34.) Additionally, Plaintiffs claim that Pickens physically restrained Alex to a Rifton chair[23] and abandoned him in a room by himself, many times with the door shut and the lights out ranging from thirty minutes to hours at a time. (Compl. ¶ 40–42.) Most importantly, Plaintiffs allege that Pickens slammed Alex's head into a metal locker nearly every day (Compl. ¶ 46). This amount of force, if true, is objectively "ob-

---

**23.** A Rifton chair is an adaptive positioning chair utilized for individuals who have special needs in the classroom.

viously excessive" under the totality of the circumstances presented here.

First, Plaintiffs allege facts that suggest that this abuse served no need at all because it did not "attempt to serve pedagogical objectives." *T.W.*, 610 F.3d at 600. It was not imposed in an attempt to "restore order, maintain discipline, or protect [the student] from self-injurious behavior." *Compare T.W.*, 610 F.3d at 600 (holding that a teacher's physical restraint on a student served some pedagogical objective when the student disobeyed instructions, called the teacher names, threatened to have the teacher arrested, swung his hands at the teacher, and refused to stop scratching an insect bite that had become infected), *with B.M. ex rel. M.F. v. Thompson*, No. 3:13–CV–13–J–12JBT, 2013 WL 4547344, at *5 (M.D.Fla. Aug. 27, 2013) (denying a defendant's motion to dismiss when there were allegations that the teacher's throwing a pencil at a student's head was unprovoked), *and Hatfield*, 534 Fed.Appx. at 845–46 (holding that the need for a teacher to strike a defenseless child in the head was nonexistent because the teacher was not acting in self defense, or with a disciplinary purpose, or in an attempt to protect the child).

Specifically, the Complaint alleges that Pickens abused Alex because he failed to pay enough attention to her, failed to put his belongings into his locker, and failed to walk fast enough. It is plausible that Alex posed challenges in the classroom—but none of these challenges suggest a need to impose this kind of force. This is especially true given Alex's disabilities. *T.W.*, 610 F.3d at 600; *O.H. v. Volusia Cnty. Sch. Bd.*, No. 07–CV–1545–ORL–22DAB, 2008 WL 2901044, at *3–4 (M.D.Fla. July 23, 2008) (teacher should have expected autistic students to engage in off-task behaviors, and her disciplinary response was disproportional). Given Alex's significant physical and mental disabilities, Pickens should have expected Alex would encounter difficulty paying attention. And it is especially inconceivable that any action involving serious physical force was needed for a child with cerebral palsy and other motor impairments simply because he was walking too slowly. Alex's failure to walk quickly does not suggest he posed a harm to himself or others. Accordingly, Plaintiffs plead plausible facts that suggest there was a nonexistent need for force at the motion to dismiss stage, although the facts at summary judgment may demonstrate otherwise.

Because Plaintiffs allege a non-existent need of force, the force exercised was "totally unrelated to the need for [its] use." *Compare T.W.*, 610 F.3d 588 at 601 (restraining autistic student by pinning his arms behind his back was not excessive given student's refusal to leave classroom, use of vulgarities, and threats to have teacher arrested) with *M.S. ex rel. Soltys v. Seminole Cnty. Sch. Bd.*, 636 F.Supp.2d 1317, 1324 (M.D.Fla.2009) (finding it disproportionate to slam an autistic student on a desk for the failure to pay attention or control bodily functions because the conduct being addressed "was that of the uncontrollable behavior of a special needs student") and *J.V. v. Seminole Cnty. Sch. Bd.*, No. 6:04–CV–1889–ORL–28J, 2007 WL 7261470, at *8 (M.D.Fla. Mar. 21, 2007) (explaining that a teacher body slamming an autistic student on desk for screaming, arm flapping, and self-stimulation was a disproportionate response because the conduct addressed was normal behavior among autistic children).

For example, slamming a physically disabled student's head into a metal-locker is an extreme and disproportionate response to that student's tendency to walk slowly or failure to put items away in his locker. Alex's inability to walk quickly is a normal and uncontrollable behavior for someone

who suffers from cerebral palsy.[24] This typical conduct for a child with significant physical disabilities does not warrant a violent physical response. Likewise, failing to pay attention or not understanding instructions is a common behavior for a student who has major intellectual disabilities. Accordingly, the discipline inflicted, which included slamming a disabled student's head into metal locker on a daily basis, was a disproportionate response to the unremarkable behavior of a student with these types of mental and physical disabilities, absent violent behavior by the student.

Finally, although Plaintiffs have not alleged any serious bodily injury to Alex other than scrapes and bruises as a result of being pushed down repeatedly and having his head frequently slammed into a metal locker, his alleged injuries are nevertheless still severe. Specifically, Alex alleges he now suffers from post-traumatic stress disorder and must take anti-anxiety medication to cope with the psychological impact of repeated assaults. And he alleges that he suffered a severe regression in a number of areas, including speech, language, and toileting. (Final Decision ¶ 56.) Although his injuries are primarily psychological, this does not detract from their severity under the circumstances presented here. *T.W.*, 610 F.3d at 601 (students "who suffer from severe developmental disabilities, are particularly vulnerable to psychological harm, and psychological injuries can be as traumatic, if not more traumatic, than physical injuries"); *see also B.M.*, 2013 WL 4547344, at *5 (explaining that allegations of a disabled child's post-traumatic disorder caused by being hit with a pencil were severe enough to "state a plausible claim for relief in that they raise a reasonable expectation that discovery will reveal evidence sufficient to establish a violation of [the student's] constitutional rights").

### 2. Pickens' Subjective Intent

If the alleged facts are true, then the *Neal* factors plainly indicate that Pickens used an obviously excessive amount of force on the Plaintiff. The Court also finds that Plaintiffs have alleged facts that support the subjective intent-focused component of the "shocks the conscience" test.

 The Eleventh Circuit has instructed district courts assessing the intent prong of substantive due process claims to consider whether a defendant's conduct creates an inference of malice. *Hatfield*, 534 Fed.Appx. at 847. For example, if a teacher makes derogatory comments during the alleged abuse, that tends to weigh in favor of finding malice. *Id.* (concluding a teacher's actions were inspired by malice because she struck a disabled student while calling him, "fat-ass," "tons of fun," and "retard;" and exclaimed the student was "sucking up the oxygen"). In addition, if the school employee's acts are part of a pattern of abusive conduct, this too suggests the presence of malice. *M.S.*, 636 F.Supp.2d at 1325; *see also Kirkland ex rel. Jones v. Greene Cnty. Bd. of Educ.*, 347 F.3d 903, 904 (11th Cir.2003) (explaining that a principal's conduct was intentional as he repeatedly struck an unarmed student with a metal cane, who was not acting in any threatening manner.) Finally, if the school employee's actions present a "foreseeable risk of serious bodily injury," this too suggests that the employee acted maliciously. *See Kirkland*, 347 F.3d at 904 (holding a principal acted with intent as he repeatedly struck a student in the head with a metal cane presenting a reasonably foreseeable risk of bodily injury.)

---

24. The Plaintiff attributes his inability to walk fast as a result of his physical disabilities, (Pls.' Resp. at 26), and the Court also takes judicial notice that the inability to walk quickly is a normal behavior associated with cerebral palsy.

Malice is easy to find from Plaintiffs' allegations. Pickens allegedly called her students vulgar names, engaged in years of abuse, and acted in ways that were likely to cause serious injury. Based on the Complaint's allegations, it would be difficult to believe that Pickens' actions were not malicious. Construing the allegations as true, the Court therefore finds Ms. Pickens' conduct to be the "kind of egregious official abuse of force that would violate substantive due process protections." *Id.* at 1076. Accordingly, Plaintiffs have pled sufficient facts to allege a substantive due process claim under the Georgia and federal constitutions.[25]

### F. Equal Protection Claims

Plaintiffs also allege that Alex's equal protection rights under the federal and Georgia constitutions were violated. The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). At its heart, the clause is a mandate that "all persons similarly situated should be treated alike" by the government. *Id.* The Equal Protection Clause of the Georgia constitution is coterminous with that of the federal constitution, and so the same analysis applies to Plaintiffs' state and federal equal protection claims. *Smith v. Atlanta Independent School District,* 633 F.Supp.2d 1364, 1380 (N.D.Ga.2009) (citing *Nodvin v. State Bar of Ga.,* 273 Ga. 559, 544 S.E.2d 142, 145 (2001)).

Plaintiffs allege that Alex is "a member of an identifiable class that is subject to disparate treatment by the State." *Smith,* 633 F.Supp.2d at 1381 (citing *Realty v. Strickland,* 830 F.2d 1107, 1114 (11th Cir.1987). "For a group to qualify properly as identifiable for the purposes of an Equal Protection Clause claim, substantive group characteristics must pop out that allow [the court] to separate readily entities or people into discrete groupings that suffered the alleged discrimination and those persons that did not." *Corey Airport Services, Inc. v. Clear Channel Outdoor, Inc.,* 682 F.3d 1293, 1297 (11th Cir.2012) (granting summary judgment against plaintiff who alleged it was member of group of "outsiders" to city hall politics, who were treated differently than "insiders;" this "vague category [was] inadequate because these idea-based characteristics do not allow us to separate readily people and entities into discrete groupings").

Here, Plaintiffs asserted that Alex is a member of an identifiable group of students with severe disabilities who are non-verbal, and who were intentionally treated differently because of those profound disabilities. Specifically, they allege that non-verbal disabled students like Alex were abused and that abuse was systemically concealed by FCSD employees. Plaintiffs then allege that disabled students who were verbal and non-disabled students were not abused or, if they were abused, that abuse was not covered up. (Compl. ¶¶ 119, 156–58.)[26]

25. Georgia courts have recognized that the due process guarantees of the Georgia and federal constitutions are "substantively identical." *Cherokee Cnty. v. Greater Atlanta Homebuilders Ass'n, Inc.,* 255 Ga.App. 764, 767, n. 1, 566 S.E.2d 470 (2002). Therefore, the Court also allows the substantive due process claims under the Georgia constitution to move forward against FCSD and Boyd.

26. Defendants argue that "Plaintiffs have scarcely even attempted to allege facts plausibly establishing that FCSD treated [Alex] less favorably that similarly situated students because of his disability." (Defs.' MTD at 24.) This argument has surface appeal, as allegations under these counts are not always wholly fleshed out. But the allegations speak for themselves: non-disabled, non-verbal students

■ Disabled individuals are not members of a suspect class, and therefore government actions that treat them differently from others are subject to a rational basis standard of review. *Cleburne*, 473 U.S. at 444, 105 S.Ct. 3249. However, a number of courts have found that a school district that treats its disabled students differently from other students by disciplining them or dealing with reports of abuse against them differently may run afoul of the equal protection clause. *E.g., Vicky M. v. Northeastern Educational Intermediate Unit 19*, 486 F.Supp.2d 437, 457 (M.D.Pa. 2007) ("A disability, such as autism, is not a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation. Nevertheless ...[these students plead a claim that teacher] repeatedly discriminated against the Minor–Plaintiff and other autistic students in her class by inflicting physical and emotional abuse" on them) (internal quotation marks omitted); *H.M. v. Board of Education of the Kings Local School Dist.*, 117 F.Supp.3d 992, 1003 (S.D.Oh.2015) (denying dismissal, district court found it reasonable to infer that abusive "treatment was solely due to Plaintiff-children's multiple handicaps without any rational relationship to a legitimate governmental purpose and that non-disabled students were not treated in the same manner"); *Vicky M. v. Ne. Educ. Intermediate Unit 19*, 486 F.Supp.2d 437, 457 (M.D.Pa.2007) *on reconsideration*, No. CIV.A. 3:06–CV–01898, 2007 WL 2844428 (M.D.Pa. Sept. 26, 2007) ("Plaintiffs have alleged that Defendant Wzorek repeatedly discriminated against the Minor–Plaintiff and other autistic students in her class by inflicting physical and emotional abuse upon them, but did not so discriminate against her other special education students."); *see also Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir. 1994) ("A municipality is not constitutionally required 'to protect an individual against private violence,' but a municipality may not operate under a custom in which it 'selectively [denies] its protective services to certain disfavored minorities without violating the Equal Protection Clause.") As with the above cases, Plaintiffs have alleged a viable Equal Protection claim.

FCSD, the Individual Defendants, and Boyd argue that Plaintiffs failed to allege that a "similarly situated" comparator group of students received more favorable treatment. In other words, they claim that Plaintiffs have not pled facts that indicate that Alex and other non-verbal disabled students were treated differently at all. (*E.g.*, Doc. 111 at 16.) But Plaintiffs have pled—albeit generally—that non-disabled students and disabled students who were verbal were not subject to the same abusive treatment as non-verbal disabled students, not housed in the same part of Hopewell, and reports of their abuse were not ignored.

■ And in any event, determining whether two groups of individuals are similarly situated is generally a question of fact for the jury, *Smith*, 633 F.Supp.2d 1364, 1382 (N.D.Ga.2009), and frequently tied up with the merits of the claim itself. *See, e.g., In re Marriage Cases*, 43 Cal.4th 757, 76 Cal.Rptr.3d 683, 183 P.3d 384, 435 n. 54 (2008) (requiring threshold analysis

were allegedly abused for years while kept in a segregated hallway, and their parents never knew about the abuse because their children could not tell them. Developmentally-typical middle school-aged students would have been able to inform their parents or caretakers. Given the totality of the facts alleges, Plain- tiffs' complaint plausibly raises an inference that verbal students with disabilities and students without disabilities were not treated in the same way as the non-verbal students with disabilities who were placed in Pickens' class- room.

of whether plaintiff is similarly situated to a comparator would "insulate the challenged [anti-gay] marriage statute from *any* meaningful equal protection review" by "obviating any need for this court even to consider which standard of review applies to plaintiffs' equal protection claims"); *see also Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia*, 93 F.3d 910, 954–55 (D.C.Cir.1996) (Rogers, J., dissenting) ("Determining the purpose of government action before embarking on a similarly-situated analysis is inherent in the individual nature of equal protection rights.")[27] Dismissal of the Equal Protection claims is therefore inappropriate.[28]

### G. Cruel and Unusual Punishment Claims

 Plaintiffs finally contend that Defendants' actions violated Alex's federal and state constitutional right to be free from cruel and unusual punishment. These claims are misplaced because, as Defendants correctly recognize, neither the Eighth Amendment to the United States Constitution nor Article 1 of the Georgia Constitution is the appropriate vehicle to bring claims for excessive corporal punishment.

In *Ingraham v. Wright*, 430 U.S. 651, 671, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the United States Supreme Court held that "when public school teachers or administrators impose disciplinary corporal punishment, the Eighth Amendment is inapplicable." Instead, "[t]he pertinent constitutional question is whether the imposition is consonant with the requirements of due process." *Id.* The Court explained that school children were not protected by the Eighth Amendment because the amendment only pertained to "the method or kind of punishment imposed for the violation of criminal statutes." *Id.* at 667, 97 S.Ct. 1401; *see also T.W. ex rel. Wilson v. School Bd. of Seminole Cnty., Fla.*, 610 F.3d 588 n. 14 (11th Cir.2010) ("The Eighth Amendment does not apply to excessive force against students") (citing *Ingraham*, 430 U.S. at 664, 97 S.Ct. 1401).

Plaintiffs argue that it is ridiculous that "a person convicted of violent rape or murder would have more constitutional rights than a disabled child who cannot report the horrific abusive punishment he suffered for an entire year." (Pls.' Resp. at 41.) This fear is misguided. When it comes to excessive force, *Ingraham* does not suggest that prisoners have more constitutional rights than public school students, just different ones. 430 U.S. at 672, 97 S.Ct. 1401 ("[C]orporal punishment in public schools implicates a constitutionally protected liberty interest, but ... traditional common-law remedies are fully adequate to afford due process.")

Plaintiffs' claim based on alleged cruel and unusual punishments under the Georgia Constitution is also misplaced. Plaintiffs cite no Georgia case recognizing a

---

**27.** The Court acknowledges that some courts have declined to find disabled students "similarly situated" to non-disabled students or other disabled students with different challenges. But that determination seems to be typically made at summary judgment when the court can also examine the purposes of the differential treatment—in other words, the court can dig into the merits of the equal protection claim itself. *E.g., Ebonie S. v. Pueblo School Dist. 60*, 819 F.Supp.2d 1179, 1190 (D.Colo.2011) (decided at summary judgment;

plaintiff could not assert that she was similarly situated to non-disabled students because she also "argues she should not be compared to [them] for behavior purposes").

**28.** The Court does note that this claim poses potential qualified immunity issues. However, because they have not been sufficiently briefed other than by Boyd, the Court finds that applying qualified immunity at this stage would be premature. The parties may raise this argument at summary judgment.

state constitutional cruel and unusual punishment claim in the public school context, and the Court has found none. On the contrary, just as under the federal constitution, Georgia's constitutional right to be free from cruel and unusual punishment relates "to punishment imposed by sentences on conviction for criminal offenses." *Hill v. State*, 119 Ga.App. 612, 168 S.E.2d 327, 330 (1969). Excessive school discipline cases like the one here, on the other hand, are routinely analyzed under Georgia's constitutional right to due process. *E.g.*, *D.B. v. Clarke County Bd. of Education*, 220 Ga.App. 330, 469 S.E.2d 438, 441 (1996) (analyzing permanent expulsion under Georgia's due process clause); *Gamble v. Ware County Bd. of Education*, 253 Ga.App. 819, 561 S.E.2d 837, 841 (2002) (analyzing sexual misconduct report by school against student under Georgia's due process clause). For these reasons, the Court **GRANTS** all Defendants' Motions to Dismiss Plaintiffs' cruel and unusual punishment claims.

## H. ADA and Section 504 Claims

Defendants, including FCSD, next argue that the ADA and Section 504 claims should be dismissed. The Court first addresses these claims as to FCSD, and then as to the Individual Defendants and Boyd.

FCSD seems to suggest that sovereign immunity protects it from liability.[29] This is not so. The "Eleventh Circuit has concluded that states that accept federal funding ... waive Eleventh Amendment immunity for Section 504 Rehabilitation Act claims." *Gary v. Georgia Dept. of Human Resources*, 323 F.Supp.2d 1368, 1373 (M.D.Ga.2004) (citing *Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1290–93 (11th Cir.2003) (per curiam). And the Eleventh Circuit has concluded that "School District[s] are not an "arm of the State" of Georgia entitled to Eleventh Amendment immunity" with respect to ADA claims. *Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 778 (11th Cir.2014). FCSD's Motion to Dismiss the ADA and Section 504 claims is therefore **DENIED**.[30]

### 1. ADA Claims

Plaintiffs also argue that Boyd and the Individual Defendants violated the ADA with respect to the treatment of Alex. These Defendants have moved to dismiss the Complaint on the grounds that they cannot be sued in their individual capacity. Plaintiffs do not identify exactly which provision of the ADA they sue under, instead broadly asserting that the "ADA and Section 504 apply to Individuals." (Pls.' Resp., Doc. 102 at 54.) This matters quite a bit, since some provisions of the ADA impose individual liability where others do not. The Court understands Plaintiffs to assert that complaints under the ADA can be brought against defendants in their individual capacities under §§ 12203, 12182, and 12112.[31] None of these Sections of the

---

29. Defendants do not expressly make this contention in their Motion, but do assert that they move to dismiss all claims except the attorney's fees claim in Count 1. Thus, the Court presumes that FCSD is asserting sovereign immunity as to the ADA and Section 504 claims.

30. As noted above, FCSD offers no real resistance to the ADA and Section 504 claims against it, for good reason. A "school district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprive[s] a disabled student of access to the school's resources" is actionable under Title II of the ADA. *K.M. ex rel. D.G. v. Hyde Park Cent. School Dist.*, 381 F.Supp.2d 343, 359 (S.D.N.Y.2005).

31. Plaintiffs' Response explicitly relies upon Sections 12182 and 12203, and the Court reads the Response as relying on Section 12112 as well.

ADA provide for individual liability under the circumstances of this case.

The ADA's retaliation provision, § 12203, states:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203.

 Here, Plaintiffs are correct that the Eleventh Circuit has recognized that "an individual may be sued privately in his or her personal capacity for violating § 12203 in the public services context." *See Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 (11th Cir.2003). However, they do not assert Alex was victim of retaliation as a result of trying to enforce his rights under the ADA. They merely contend that he was discriminated against on the basis of his disabilities. (Doc. 84 at ¶ 160.) Accordingly, Plaintiffs fail to allege sufficient facts to plead a violation of § 12203.

 So too with Plaintiffs' Section 12182 claims. Section 12182 provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182. Courts have repeatedly held that this provision only applies to private entities operating public accommodations, not public entities.[32] *Bloom v. Bex-*

*ar County, Tex.* 130 F.3d 722, 726–27 (5th Cir.1997) (collecting cases from, among others, the Sixth, Eighth, and Ninth Circuits). Here, § 12182 is inapplicable because a school within the Fulton County School District is a public entity, and so this section of the ADA does not apply to its employees.

 Finally, the Individual Defendants (and Boyd) are not liable under § 12112, because the Eleventh Circuit has held that this provision of the ADA "does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir.1996). Under the facts alleged here, Plaintiffs do not state an ADA claim against Boyd or the Individual Defendants. The ADA claims against them are therefore **DISMISSED**.

## 2. Section 504 of the Rehabilitation Act

 Plaintiffs next argue that Boyd and the Individual Defendants violated Section 504 of the Rehabilitation Act with respect to their treatment of Alex. But this statute does not provide for individual liability. *Berkery v. Kaplan*, 518 Fed.Appx. 813, 814–15 (11th Cir.2013). Accordingly, the Court **GRANTS** Boyd and the Individual Defendants' Motion to Dismiss Plaintiffs' Section 504 claims as to them.

## I. Remaining Claims against Individual Defendants and Boyd

The Court turns next to Plaintiffs' conspiracy claims. Plaintiffs purport to bring conspiracy claims based on virtually every one of their state and federal law counts, against each Defendant. This appears to mean that Plaintiffs are arguing for both state law and § 1983 conspiracy liability.

---

**32.** These cases generally rely on the language of 42 U.S.C. § 12181(7), which provides: "The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce [:] .... a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education."

The Court notes that it appears that Defendants understand this as well, though they focus much of their briefs on arguing that Plaintiffs have failed to identify a predicate tort under state law and that Defendants are entitled to official immunity. (*See* FCSD's Motion, Doc. 87–1 at 38–40, citing *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271 (11th Cir.2002) for the elements of a § 1983 conspiracy claim, and noting that Plaintiffs allege that "all Defendants conspired to cover up [Counts 2 through 19]"; *see also id.* at 31 (arguing for official immunity)). Both parties advance arguments about whether the intracorporate conspiracy doctrine applies and cite § 1983 or 1985(3) cases in support of their positions.

As discussed below, the Court agrees that Plaintiffs' state tort law conspiracy claims are barred by official immunity against all Defendants save Boyd. However, the Court finds that Plaintiffs have stated § 1983 conspiracy claims against some (but not all) individual Defendants. Finally, the Court finds that Plaintiffs have successfully alleged that FCSD conspired with Boyd, Pickens, and others to cover up violations of Alex's substantive and procedural due process and equal protection rights, and have thus stated conspiracy claims against FCSD under both the United States and Georgia constitutions. The Court notes that the high bar of *Monell* will still apply to the federal claims, *Weiland*, 792 F.3d at 1330 (holding that a § 1983 conspiracy claim against a municipality must successfully allege the existence of a policy or custom), and that the conspiracy claims against FCSD suffered from under-briefing due to the massive number of issues presented. Plaintiffs have cleared this bar at the motion to dismiss stage, but the Court anticipates hearing more from the Parties on this issue at summary judgment.

### 1. Individual v. Official Capacity and Sovereign Immunity

Plaintiffs, through counsel, claim that more than two-dozen individual Defendants should be held liable for conspiracy to commit virtually every count in the Complaint. In response, the Individual Defendants argue that, although Plaintiffs allege they are suing the Individual Defendants in their individual or personal capacities only, Plaintiffs' allegation that the Individual Defendants were at all times acting "within the scope of their employment" demonstrate that they are suing these Individual Defendants in their official capacity. As such, the Individual Defendants argue, Plaintiffs' state law tort claims against them are barred by sovereign immunity. Like many litigants and courts wading into the world of Georgia immunity doctrines, Defendants have mixed and sometimes confused the applicable immunity concepts.

Under Georgia law, suits against state officials acting within the scope of their authority can be brought against them in their "official capacity" or their "personal capacity." If the suit is brought against a state official in her "official capacity," the suit is "in reality [a] suit[ ] against the state and, therefore, involve[s] sovereign immunity." *Gilbert v. Richardson*, 264 Ga. 744, 452 S.E.2d 476, 478–79 (1994) (quoting *Donaldson v. Dep't of Transp.*, 262 Ga. 49, 414 S.E.2d 638, 643 (1992) (Hunt, J., concurring)). Thus, Georgia courts generally use the term "official capacity" to refer to a claim against a Georgia official, which is treated as a claim against the state agency or department employing that official, and thus a claim against the state. *See City of Atlanta v. Mitcham*, 296 Ga. 576, 769 S.E.2d 320, 326–27 (2015). Perhaps a more apt term to use would be "governmental capacity," as suits against individuals in their official

capacity are in fact suits against the government. *See Gilbert*, 452 S.E.2d at 480–81. Whatever its nomenclature, this Court has already determined that any state law tort claim asserted here against an individual, to the extent such claim is essentially a claim against the state, is barred by the doctrine of sovereign immunity. (*See* Jan. 9, 2015 Ord. at 23–30, Doc. 83.)

 On the other hand, sovereign immunity does not bar claims against state officers based on conduct performed during the scope of their employment to the extent the officers are sued in their "individual or personal capacity." The terms "individual" and "personal" colloquially suggest that such claims are directed towards officers who are acting personally rather than in any sort of official capacity. Under Georgia immunity law, however, these terms typically refer to officials who are sued based on conduct they personally performed while in the course and scope of their official employment. *See Todd v. Kelly*, 244 Ga.App. 404, 535 S.E.2d 540, 542 (2000) (noting that qualified immunity applies to officers and employees of counties performing "official functions," defined as those "performed within the officer's or employee's scope of authority, including both ministerial and discretionary acts.") For such claims, the appropriate state immunity defense is "official immunity," which, as discussed below, is similar to the doctrine of qualified immunity under federal law. *See Gilbert v. Richardson*, 264 Ga. 744, 452 S.E.2d 476, 481 (1994); *see also* Ga. Const. art. I, § II, ¶ IX(d). Sovereign immunity is not necessarily implicated by the allegation that an officer is acting within the scope of his employment.

Plaintiffs have now clarified that their claims against Boyd and the Individual Defendants are in fact against them solely in their individual or personal capacity. And Plaintiffs confirm that "all [Individual Defendants'] acts set forth [in the Second Amended Complaint] were within the scope of their employment as FCSD employees." (2d Am. Compl. ¶ 10, Doc. 84.) The Court therefore rejects Boyd and the Individual Defendants' Motions to Dismiss on sovereign immunity grounds.

## 2. Official Immunity

 The Individual Defendants and Boyd next assert that, for purposes of all state law tort claims, they are entitled to official immunity. "The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity." *Cameron v. Lang*, 274 Ga. 122, 549 S.E.2d 341, 344 (2001) (emphasis added). Individual government employees are shielded by official immunity from damages suits unless the plaintiff can establish that the official negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure.[33] *See Grammens v. Dollar*, 287 Ga. 618, 697 S.E.2d 775, 777 (2010); *Glass v. Gates*, 311 Ga.App. 563, 716 S.E.2d 611, 621 (2011), *cert. granted* (Jan. 23, 2012), *aff'd*, 291 Ga. 350, 729 S.E.2d 361 (2012). The Court thus first considers the nature of the alleged acts performed, and then, depending on the resolution of this first inquiry, the Court determines whether the allegations support negligence, if the acts are ministerial in nature, or actual malice, if the acts are discretionary.

---

**33.** State officials may also be liable for acts conducted outside the scope of their authority. However, the Court does not take Plaintiffs to argue that in the section of their brief addressing official immunity. Instead, Plaintiffs argue "[t]hat each individual Defendant took acts as an employee of FCSD and in the scope of employment as FCSD educators does not mean they are immune." (Doc. 102 at 42.) Plaintiffs then focus the rest of their argument on the malice issue discussed below, and do not substantively address the "scope of authority" issue. The Court will not make that argument for Plaintiffs.

### a. Ministerial v. Discretionary Tasks

None of the alleged acts that serve as the basis for Plaintiffs' claims against the Individual Defendants and Boyd are ministerial acts. "The determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." *Greenway v. Northside Hosp., Inc.*, 317 Ga.App. 371, 730 S.E.2d 742, 749 (2012) (internal citation and punctuation omitted); *Vann v. Finley*, 313 Ga.App. 153, 721 S.E.2d 156 (2011). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Grammens*, 697 S.E.2d at 777. "A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*

Just because an action is "statutorily-mandated" does not mean it is "the equivalent of a ministerial act that deprives the actor of official immunity if done negligently." *Murphy v. Bajjani*, 282 Ga. 197, 647 S.E.2d 54, 57 (2007) (holding that the mandated act in O.C.G.A. § 20–2–1185 of developing a school safety plan was a discretionary act because it required the exercise of personal deliberation and judgment, and thus, a school district was immune from liability for failing to create a safety plan, absent evidence of malice); *Todd v. Brooks*, 292 Ga.App. 329, 665 S.E.2d 11, 13 (2008) (holding that, although a sheriff must by statute impound stray livestock, because the statute did not provide "clear, definite and certain procedures for impounding the bull," because "his duty to impound was not simple or specific," and because the sheriff was "required to make decisions concerning the safety of himself and others" he was "required to exercise considerable deliberation and judgment, which rendered his actions discretionary"). Instead, "[p]rocedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty." *Roper v. Greenway*, 294 Ga. 112, 751 S.E.2d 351, 353 (2013).

In the public school setting, Georgia courts routinely hold that a teacher's or administrator's actions are discretionary if, at their core, the actions involve supervising students or staff, even if there is a mandatory dimension to the defendant's actions. *See, e.g., Harper v. Patterson*, 270 Ga.App. 437, 606 S.E.2d 887, 892 (2004) (supervisor was engaged in a discretionary task when she allegedly failed to adequately supervise a paraprofessional who was accused of repeatedly sexually abusing, harassing and exploiting a special education student); *Payne v. Twiggs Cnty. Sch. Dist.*, 232 Ga.App. 175, 501 S.E.2d 550, 551–52 (1998) (holding that, despite a clear no-weapons policy at a school, a school employee was required to assess the credibility of a student's allegations regarding the presence of a weapon and "make a [discretionary] judgment call as to whether those allegations merited immediate investigation") (collecting cases involving the failure to enforce school policy governing supervision of students); *Reece v. Turner*, 284 Ga.App. 282, 643 S.E.2d 814, 817 (2007) (holding that, although the plaintiff "framed" her claims against school officials as a failure to perform mandatory supervisory duties including never being alone in the room with a student, the "crux of [the] complaint against the appellants [was] that they negligently failed to supervise ... a student and ... an employee in a manner sufficient 'to protect [the student] from molestation' " and thus, the alleged mis-

conduct was discretionary in nature); *see also Smith v. McDowell*, 292 Ga.App. 731, 666 S.E.2d 94, 96–98 (2008) ("Not one recent case exists in which the Georgia courts have found a ministerial duty on the part of a school employee").

■ Plaintiffs erroneously argue that the Individual Defendants' and Boyd's actions were ministerial. First, they assert that, by virtue of a written FCSD policy, corporal punishment was disallowed. (*See* Compl. ¶¶ 137–138.) Thus, according to Plaintiffs, "[t]here is no discretion when corporal punishment cannot, by written FCSD policy, be administered." (Pls.' Resp. at 43, Doc. 102.)

However, Plaintiffs do not allege that Boyd and the Individual Defendants themselves engaged in corporal punishment. Instead, as to these Defendants, Plaintiffs allege that they failed to fulfill their mandated reporting requirements or otherwise failed to document the alleged abuse and notify the parents about this abuse. Thus, the relevant inquiry as to these Individual Defendants is not whether the application of corporal punishment is a ministerial or discretionary task, but instead whether the Individual Defendants' professional failures were, at their core, ministerial tasks. The Court finds that none of the alleged conspiratorial acts of the Individual Defendants were ministerial in nature. Determining what conduct crosses the line from appropriate classroom management techniques to inappropriate abuse or punishment such that the conduct should be documented, reported, or addressed in an IEP meeting unquestionably involves the type of professional judgment typical of a discretionary task. Accordingly, the Individual Defendants and Boyd are entitled to official immunity unless Plaintiffs allege sufficient facts to plausibly suggest they acted with malice.

### b. Malice or Intent to Injure

■ Because the alleged misconduct attributed to the Individual Defendants and Boyd is discretionary in nature, they are entitled to official immunity unless they acted with "actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d).[34] The phrase "actual intent to cause injury" refers to "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Kidd v. Coates*, 271 Ga. 33, 518 S.E.2d 124, 125 (1999) (internal quotation marks omitted) (quoting *Frame v. Boatmen's Bank*, 782 S.W.2d 117, 121 (Mo.Ct. App.1989)).

■ In the context of official immunity, "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." *Adams v. Hazelwood*, 271 Ga. 414, 520 S.E.2d 896, 898 (1999) (internal citations and quotation marks omitted) (quoting *Merrow v. Hawkins*, 266 Ga. 390, 467 S.E.2d 336, 338 (1996)). The Georgia Supreme Court has held that the terms "actual malice" or "malice in fact" are distinguished from "implied malice," a term which has been defined to mean conduct exhibiting a "reckless disregard" for the rights or safety of others. *Merrow v. Hawkins*, 467

---

34. Under Georgia law, it is not clear whether "actual malice" and "actual intent to cause injury" are in fact separate and distinct principles. *Compare Kidd v. Coates*, 271 Ga. 33, 518 S.E.2d 124, 125 (1999) (assuming for the purpose of that case only that "actual malice" and "actual intent to cause injury" are different concepts), *with Murphy v. Bajjani*, 282 Ga. 197, 647 S.E.2d 54, 60 (2007) (explaining that the term "actual malice" refers to "a deliberate intention to do wrong" and the term "'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs").

S.E.2d at 338 (abrogating cases decided prior to 1991 amendment to Art. I, Sec. II, Par. IX of the Georgia Constitution defining "malice" as opposed to "actual malice" as involving reckless disregard for the rights of others).

 In other words, "[a] 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." *Murphy*, 647 S.E.2d 54, 60 (2007) (holding that conclusory allegations of malice were insufficient to survive a motion for judgment on the pleadings because they alleged only "deliberate acts of wrongdoing done with reckless disregard for the safety of others"). And so actual malice requires something more than deliberate indifference. *Kendall v. Sutherland*, No. 1:13–CV–04263–RWS, 2014 WL 5782533, at *16 (N.D.Ga. Nov. 5, 2014) ("Even if he was deliberately indifferent or reckless in ignoring inmate complaints, Plaintiffs' First and Second Amended Complaints fail to establish malice"); *but see Adams v. Hazelwood*, 271 Ga. 414, 520 S.E.2d 896, 898–99 (1999) ("[I]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act. . . . Such act may be accomplished with or without ill will and whether or not injury was intended").

In *Murphy*, for example, the plaintiffs sued the Gwinnett County School District, the superintendent of the school system, the principal of the school their child attended, and others, alleging that the defendants maliciously failed to implement a safety plan and as a result, their child was assaulted, suffering serious injuries. *Id.* at 56. To address malice, the plaintiffs alleged the following:

- "this failure [to develop and implement an effective security plan] is both willful and wanton, malicious and corrupt arising solely from a systemic need to avoid publicity as an unsafe school system," *id.* at n. 6;

- "this failure [to seek immediate medical attention for Timothy] is both willful and wanton, malicious and corrupt arising solely from a systemic need to avoid publicity as an unsafe school system," *id.*; and

- "this failure to seek immediate medical attention for [Timothy] . . . is both willful and wanton, malicious and corrupt arising from a systemic need to avoid publicity as an unsafe school system," *id.*

The Georgia Supreme Court rejected the argument that these allegations were sufficient to support an inference of malice. Rather than alleging facts suggesting "an intent to cause the harm suffered by the plaintiffs . . . [the] plaintiffs' allegations of malice are of deliberate acts of wrongdoing done with reckless disregard for the safety of others." *Id.*

 As to some Individual Defendants, Plaintiffs have alleged facts suggestive of gross negligence or recklessness. But none of the non-conclusory allegations in the Second Amended Complaint render plausible Plaintiffs' assertion that any of the Individual Defendants, other than Boyd, acted with intent to cause the harm suffered by Alex Williams. The Court could arguably speculate based on allegations in the Second Amended Complaint, as apparently Plaintiffs have, that some of the Individual Defendants in fact conspired with each other to intentionally and maliciously harm individual special education students generally and Alex Williams in particular. But based on the totality of allegations in the Second Amended Complaint, such speculation is wholly implausible. And in any case, to overcome a motion to dismiss, Plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

Instead, what Plaintiffs have pled is a pattern of deliberate indifference, concealment, neglect, bureaucratic paralysis, and ignorance. That is troubling enough. Accordingly, the state law claims against all Individual Defendants, including the state constitutional claims and state law conspiracy claims, are **DISMISSED**. *See Murphy v. Bajjani*, 647 S.E.2d at 60 (complaint must plead facts supporting the inference that the defendant-officials "intended to cause the harm suffered" by plaintiff); *Brannon v. Clinton*, No. 2:11–CV–43–RWS, 2013 WL 653285, at *11 (N.D.Ga. Feb. 21, 2013) (official immunity bars state constitutional claims in Georgia).

██ However, the Court reaches a different result with respect to Boyd. Principal Boyd allegedly set the tone for Hopewell. The facts alleged in the Complaint, if true, suggest that Boyd allegedly "cultivated an atmosphere of intimidation" by discouraging reports of Pickens' abuse and by intimidating individual reporters.

Boyd "appeared to be protective of Pickens," informed Pickens when individuals had reported her, and allegedly retaliated against at least two reporters—Reddick and a janitor. (Final Decision ¶ 27; Compl. ¶ 273, ¶ 276.) She also allegedly destroyed written reports of Pickens' abuse. (Compl. ¶ 291.) And Boyd allegedly at times exhibited contempt for the disabled students on G–Hall, and allegedly remarked that the school "should have just pulled the plug" on them. (Compl. ¶¶ 249, 257.)

Some of Boyd's conduct, if proven true, is potentially insidious enough to suggest she actively condoned Pickens' actions, and thus acted with malice. *See Caldwell v. Griffin Spalding Cty. Bd. of Educ.*, 232 Ga.App. 892, 894, 503 S.E.2d 43, 45 (Ga. App.1998) (because there was a "lack of any evidence showing that either defendant actively condoned, encouraged, or

took part in any of these initiation rites, or the violent attack on [a student, his] claim of actual malice must fail").

The Court notes that another court in this district rejected Boyd's claims of official immunity in a companion suit. *Persadi v. The Fulton County School District, et. al*, No. 1:12–CV–4072–TWT, Doc. 34 (N.D.Ga. Sept. 23, 2012). This Court agrees with its Northern District of Georgia colleague that the Complaint pleads facts that, if true, may plausibly suggest that Boyd acted with malice towards the rights of the disabled students at her school. The Court notes that Plaintiffs have a very high burden with respect to malice, and so the Court expects to hear the parties' evidence and arguments on this issue at summary judgment.

### J. § 1983 Conspiracy

### 1. Intracorporate Conspiracy Doctrine

The conspiracy claims against the Individual Defendants founded on state law violations have been dismissed. The last subset of conspiracy claims to consider are those alleging that FCSD, the Individual Defendants, and Boyd conspired to deprive Alex of his due process and equal protection rights.

██ These Defendants first argue that any conspiracy claims against them are barred by the intracorporate conspiracy doctrine. That doctrine holds "that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir.2000). The Eleventh Circuit has "enunciated but not fully adopted three exceptions to the doctrine."

*Gibbons v. McBride*, 124 F.Supp.3d 1342, 1381 (S.D.Ga.2015). The doctrine does not bar "convictions involving criminal charges of conspiracy," where the employee has an "independent personal stake" in the unconstitutional acts, and where the employees "engage in a series of discriminatory acts as opposed to a single action over a significant period of time in the employment setting." *See Grider v. City of Auburn*, 618 F.3d 1240, 1262 (11th Cir.2010).

██ Here, Plaintiffs allege that Pickens abused Alex and numerous other students over the course of several years, and that a number of FCSD employees were deliberately indifferent to that abuse and failed to act to correct it, that those employees covered it up by refusing to disclose the abuse to Alex's parents (and in some circumstances, by allegedly destroying evidence), and that they did so "outside the scope of his or her authority"—which the Court reads as asserting the independent personal stakes exception.[35] (Doc. 102 at 82.) At least one other district court in the Eleventh Circuit has found that the "independent personal stake" exception applies to the attempted cover up of abuse in a school setting. *Jordan v. Randolph Cty. Sch.*, No. 4:08–CV–131–CDL, 2009 WL 1410082, at *7 (M.D.Ga. May 19, 2009) (Land, J.) (declining to dismiss a civil rights claim alleging that a student's rape resulted from the alleged cover up of the school's failure to supervise three students who repeatedly sexually harassed and abused other students). There, the court held that the allegations in the complaint "suggest[ed] that Defendants acted based on interest of self-preservation when con-

fronted with reports of a sexual assault at school on their watch." *Id.* The Court found this was sufficient at the motion to dismiss stage and declined to dismiss a § 1985(3) conspiracy claim.

Other district courts outside of the Eleventh Circuit have also allowed plaintiffs to proceed on a theory that school officials who cover up abuse may be doing so because they have a "personal stake" in the outcome. *Doe 20 v. Bd. of Educ. of Cmty. Unit Sch. Dist. No. 5*, 680 F.Supp.2d 957, 981 (C.D.Ill.2010) (declining to apply doctrine at motion to dismiss stage, where plaintiff stated a claim alleging that four school administrators, including two principals, an assistant principal, and an assistant superintendent, knew that a first grade teacher was abusing female students and covered it up to save their own careers).

The Court agrees with *Jordan* that it is inappropriate to dismiss a complaint that pleads significant factual material that supports the plausible inference that school officials may have covered up reports of abuse in order to save their own careers. The Complaint and the Final Decision both contain factual material that supports such an inference. The Final Decision notes that FCSD school board policy was to inform parents that their children were being abused, but that allegedly did not happen here. And the Complaint and Final Decision both contain a raft of factual material that suggests, if true, that FCSD knew that Pickens was abusing children for years and ignored or concealed that abuse. The Complaint also makes specific factual allegations that FCSD employ-

**35.** The Court notes that Plaintiffs did not argue that Defendants were acting outside the scope of their authority for the purposes of official immunity, but do make this argument (albeit briefly) with respect to the intracorporate conspiracy doctrine. To the extent there is any overlap between official immunity to state law claims and the intracorporate con-

spiracy doctrine in the § 1983 context, the Court sees no tension in its holding, because Plaintiffs simply failed to properly address this issue in their response brief as to the Individual Defendants' official immunity argument. Plaintiffs did raise it with respect to the intracorporate conspiracy doctrine.

ees destroyed evidence about the abuse, including deleting Pickens' emails. (Compl. ¶¶ 358, 512.)

Therefore, under the facts presented here, the Court agrees with Plaintiffs that dismissal as to any defendant based on the application of the intracorporate conspiracy doctrine would be premature. The Court notes that FCSD itself does not appear to argue against Plaintiffs' conspiracy claims except to contend that they are barred by the intracorporate conspiracy doctrine. For that reason, the Court does not dismiss the conspiracy claims alleging that FCSD conspired to violate the federal and Georgia constitutions with respect to Plaintiffs' substantive and procedural due process and equal protection rights.

**2. Conspiracy Analyzed By Defendant**

The Court next turns to whether or not Plaintiffs have sufficiently pled a conspiracy to commit the constitutional torts alleged in the Complaint (that have not otherwise been dismissed). Plaintiffs assert that FCSD, the Individual Defendants, and Boyd conspired to cover-up, intentionally fail to report, and ignore Pickens' alleged abuse, which allowed the abuse to continue. (Pls.' Resp. at 61.)

To establish a conspiracy claim under § 1983, a plaintiff must allege three elements: "(1) a violation of [his] federal rights; (2) an agreement among the Defendants to violate such a right; and (3) an [underlying] actionable wrong." *Gibbons v. McBride*, 124 F.Supp.3d 1342, 1379 (S.D.Ga.2015) (citations and quotations omitted); *see also Grider*, 618 F.3d at 1260. The "linchpin of conspiracy is agreement, which presupposes communication." *Bailey v. Board of County Com'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir.

1992). An "agreement" may be inferred 'from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct.'" *Am. Fed'n of Labor & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1192 (11th Cir.2011);[36] *Gray v. Great Valley School Dist.*, 102 F.Supp.3d 671, 684 (E.D.Pa.2015) (student plausibly stated civil conspiracy claim against school nurse and principal, where those school officials allegedly agreed to illegally strip search the student).

The mere allegation of an agreement, by itself, is conclusory. *See Barnes v. Zaccari*, 757 F.Supp.2d 1313, 1330 (N.D.Ga.2010) *aff'd in part, rev'd in part and remanded*, 669 F.3d 1295 (11th Cir.2012) and *vacated in part on other grounds*, 592 Fed.Appx. 859 (11th Cir. 2015) (granting summary judgment against plaintiff on certain conspiracy claims because "neither the undisputed facts nor any other evidence supports the conclusory allegation that [defendant] made an agreement with anyone to violate [plaintiff's] constitutional rights.") But to allege the existence of an agreement on the part of the defendants, a plaintiff need not point to a "smoking gun;" instead, "nothing more than an 'understanding' and 'willful participation' ... is necessary to show the kind of joint action that will subject ... parties to § 1983 liability." *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir.1990).

There must also be a causal connection between the conspiracy and the underlying denial of the constitutional rights. *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir.2008); *see also Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir.1981)

**36.** While there is no heightened pleading standard applicable to § 1983 conspiracy claims, conclusory allegations need not be taken as true. *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir.2010) (Eleventh Circuit cases imposing a heightened pleading standard for § 1983 cases were "effectively overturned" by *Iqbal*, but "conclusory allegations ... are not entitled to an assumption of truth.")

(causation is "an implicit requirement" of all civil rights actions, and a "[s]ection 1985 cause of action requires the plaintiff to show 'that the acts done in furtherance of the conspiracy caused his injury.") The conspiracy must have "proximately" caused the constitutional deprivation; "mere cause in fact" is insufficient. *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir.2015) (due process claim "specifi[ed] a causal connection between the alleged cover up and the specific deprivation of [ ] constitutional rights" and so sufficiently alleged "an underlying actual denial" of rights necessary to survive dismissal); *Arnold*, 637 F.2d at 1350. In *Weiland*, a plaintiff asserting an unjust incarceration claim alleged that two officers fabricated "an elaborate story" that the plaintiff had fired at and then run from the officers when they tried to arrest him. 792 F.3d at 1327. He alleged that one of the officers took plaintiff's shotgun from his home to an unknown location, discharged it, returned to the scene, then prepared false incident reports indicating that the plaintiff had fired the weapon. The Eleventh Circuit found that the complaint alleged an agreement between the officers to cover up their actions and a causal connection between the agreement and one of the harms (incarceration) suffered by the plaintiff. *Id.* at 1328; *compare with Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir.2008) (after-the-fact cover up did not cause harm). And in *Geinosky v. City of Chicago*, a plaintiff made "conclusory direct allegations of conspiracy" of police harassment but also alleged facts showing that police issued him twenty-four parking tickets over a fourteen-month period. The Seventh Circuit found that this was a "plausible account of a conspiracy" that met the pleading standards of the Federal Rules. 675 F.3d 743, 749 (7th Cir.2012).

At least one district court in this circuit has found that covering up abuse at a school may form the basis for a civil rights conspiracy claim. *Jordan*, 2009 WL 1410082 at *7. In *Jordan*, a mother informed the principal of a high school, superintendent, and local school board chair that three boys had engaged in acts of sexual harassment against other students, including trying to look up her daughter's skirt. Those boys then raped the daughter. School officials failed to report the rape to the mother, who learned of the incident from her daughter the day after the rape occurred. The mother asserted due process, equal protection, and civil rights conspiracy claims against the district, principal, board chair, and superintendent. *Id.* at *2–4. The court dismissed the due process claims for lack of state action, but declined to dismiss the equal protection and civil rights conspiracy claims because the school's "cover[ ] up incidents of sexual misconduct" by the three students may have led to the daughter's rape. *Id.* at *7.; *see also Phillips v. Cty. of Orange*, 894 F.Supp.2d 345, 382 (S.D.N.Y.2012) (plaintiffs successfully alleged a § 1983 civil conspiracy claim against a school district, a county, and a village to jointly develop protocols permitting school officials to interview school children about whether they had been abused without reasonable cause to suspect abuse, without parental consent, and without a court order).

Here, the underlying harm is the abuse that Alex suffered, which Plaintiffs have successfully alleged may have violated his constitutional rights.[37] According to

---

**37.** The conspiracy claims purport to encompass Alex's equal protection clause claim, in addition to the substantive and procedural due process claims. The Court notes that Plaintiffs may be required to show discriminatory intent on behalf of each Defendant to succeed on a claim alleging conspiracy to violate Alex's equal protection rights. *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937. While this

the Complaint, the Individual Defendants conspired to cover up that continuing abuse. Pickens' abuse allegedly started in 2002 and continued through the Spring of 2007. The abuse was allegedly brought to the attention of FCSD officials numerous times, and each time they ignored it or, allegedly, actively suppressed reports of it. For example, Plaintiffs plead that several senior FCSD officials met and agreed to predetermine the outcome of the 2004 social worker's investigation. This fact indicates both agreement and an overt act that may have prevented the disclosure of Pickens' alleged wrongdoing. Plaintiffs plead that other FCSD officials, like Merritt and Boyd, engaged in the intimidation of employee "reporters." This too suggests an agreement to conceal abuse that goes above mere acquiescence or ineffectiveness. And other defendants allegedly took affirmative steps to conceal the abuse from parents, including doctoring or destroying evidence, again indicating an agreement with the overall plan. Plaintiffs have also pled facts that support the inference that the post-abuse cover up amplified and aggravated Alex's injuries. (Final Decision ¶¶ 41–43, 46) (describing how Alex's progress reversed course in the years following Pickens' resignation).[38] Like in *Jordan*, this plausibly suggests at the pleading stage that FCSD's, Boyd's, and the Individual Defendants' concealment of Pickens' history of abuse ultimately caused Alex's abuse. 2009 WL 1410082 at *7.

The Court notes that the allegations of a post-abuse cover up present thorny causation issues. *E.g., Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980) (individuals who allegedly conspired to cover up an officer's use of excessive force were not liable for the harm caused by the force itself). There appear to be few cases specifically addressing whether a post-abuse conspiracy to cover up the abuse can be said to have "caused" a constitutional harm. But most cases involve plaintiffs who can tell others they have been harmed, and who can therefore receive prompt treatment to alleviate that harm. Here, Alex was unable to tell others he was abused, and so his wounds—both physical and psychological—worsened. His parents could not tell why he was falling so much after being abused, and so in a bid to treat that issue he received Botox injections that left him with a diminished ability to walk. (Final Decision ¶¶ 41–42, 46.) His speech skills deteriorated too. (*Id.*) Overall, Alex's progress underwent a "slow, gradual deterioration" "[f]rom the time of the abuse until before Alex began his second year at Roswell High." (*Id.* ¶ 54.) Some of this deterioration happened after

---

issue can be addressed at the pleading stage, the Court finds that the briefs do not adequately address it, and therefore declines to dismiss the conspiracy to commit equal protection violations claims at this time.

**38.** The Court notes that there is another issue likely to rear its head at summary judgment: whether actions that occurred in 2004 or 2005 are sufficiently causally connected to Alex's abuse, or whether they caused a continuing harm that is sufficient to sustain a § 1983 conspiracy claim. It is possible that such events are simply too attenuated to allow a jury to find causation. But this appears to be a factually driven issue appropriate for summary judgment. *See Baynard v. Lawson,*

112 F.Supp.2d 524, 530 (E.D.Va.2000) (remoteness in time between a prior report of abuse and a new incident of abuse is a relevant factor in determining supervisory liability), *aff'd at* 268 F.3d 228 (4th Cir.2001) (*citing Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir.1997) (lapse of 10 years between an initial report of sexual abuse by police officer meant that police chief's decision 10 years earlier to put that officer back on the force was too remote to have been cause of a new incident of abuse); *see also Riddick v. School Bd. of City of Portsmouth*, 238 F.3d 518, 525 (4th Cir.2000) (school district did not display deliberate indifference with respect to teacher who openly filmed clothed students three years prior to abusing student).

Alex's parents learned of the abuse. But much of it occurred while they were still in the dark about what had transpired. The Court finds it plausible, at this stage, that the post-abuse cover up amplified and contributed to Alex's injuries. This causation issue will benefit from a more fully developed record.

Given the above considerations and case law, the Court sets forth the following principles, which it applies to the individual conspiracy claims:

1. Conclusory allegations that a defendant "acted in concert to ensure that the abuse was not reported" or took "actions or inactions" to ensure that Pickens was not disciplined or fired are inadequate to state a conspiracy claim, as this Court already warned. (Order, Doc. 83 at 18.) Thus, blanket assertions like those alleging that a Defendant "learned of and joined the agreement and plan not to report Pickens ... and to cover up the abuse" will be given no weight. (*E.g.*, Compl. ¶ 444.)

2. Instead, the Complaint must plead facts that indicate an agreement, and an act taken in furtherance of that agreement—like the allegations that a group of individuals met and predetermined the outcome of a 2004 social worker's investigation, allegations that an individual doctored, destroyed, or withheld evidence, and allegations that an individual instructed educators not to speak to parents about the abuse.

3. Facts that suggest a lack of agreement—like the allegation that an individual reported Pickens' alleged abuse to a superior—will control over conclusory allegations that the individual "agreed" to join the conspiracy.

4. Facts that indicate that a given individual was only aware of one or two isolated incidents of abuse, as opposed to a pattern of abuse or a single report that encompassed multiple incidents of abuse, will result in dismissal unless Plaintiffs plead other compelling facts indicating that the individual intended to join the conspiracy. The Court does not view an allegation that a defendant knew of one child being abused one time as sufficient to state a claim that a given Defendant "agreed" to cover up that abuse.

The Court applies these principles to two groups of Defendants. First, the Court discusses, as a group, the Individual Defendants for which Plaintiffs have failed to plead sufficient facts to state a conspiracy claim. The Court then turns to each Individual Defendant that remains in the case at this juncture because Plaintiffs have (if sometimes only barely) plead sufficient factual material to state a § 1983 conspiracy claim.

### 3. Individual Defendants Against Whom No Conspiracy Claim is Stated: Etris, Faulkner, Ware, Shelley, Pettes, Butler, Averett, White, McConnell, and Sosebee.

Plaintiffs' conspiracy claims fail against Etris, Faulkner, Ware, Shelley, Pettes, Butler, Averett, White, McConnell, and Sosebee, for a number of reasons. These individuals tend to share one of a few things in common that prevent the Court from drawing the inference that they "agreed" to join a conspiracy to conceal and cover up Pickens' abuse.

First, Plaintiffs fail to allege facts that suggest any of these individuals took specific actions—other than a general failure to report Pickens' abuse outside of FCSD—that indicate they intended to join the conspiracy. In fact, several of these individuals took actions that appeared to indicate that these individuals *disagreed* with the alleged conspiracy to conceal Pickens' ongoing abuse. For example, Pettes, White, and Averett all reported Pickens up the chain of command, and Butler and Faulkner trained Pickens. Others, like Etris (an IST at Holcomb Bridge,

the first school Pickens taught at) and Shelley (Director of Instruction for FCSD Services for Exceptional Children through 2004), failed to report abuse, but did not take affirmative actions that could be construed as an attempt to prevent Pickens from being reported or from covering up the alleged abuse. (*E.g.*, Compl. ¶¶ 184–88, 396.)

■ Relatedly, the Complaint makes no non-conclusory factual allegations against these Defendants that they agreed to join the conspiracy. As noted above, simply stating that someone "agreed and adopted" the plan is insufficient, without some other factual context to support that allegation. Thus, for example, Assistant Principal McConnell—who arrived at Hopewell in 2006—allegedly "readily agreed" to the plan to not report Pickens, but that allegation is conclusory, and Plaintiffs allege no concrete facts supporting it. Unlike another assistant principal, Thompson (discussed below), there are no allegations that McConnell (1) failed to cooperate with a social worker's investigation or (2) later instructed teachers not to report the abuse. Thus, Plaintiffs failed to identify specific facts indicating that McConnell intended to join the conspiracy and took actions in furtherance of it.

■ And Ware, a Special Education Coordinator, allegedly "learned at some time from 2003 to 2006 of the Defendants' mutual plan" and "accepted, adopted, and agreed" to the plan. (Compl. ¶¶ 434–35.) But the Complaint fails to say who exactly Ware "conspired with" other than "the Defendants" generally. And the Complaint only alleges one specific incident that Ware was made aware of, which occurred at an undetermined time. Because the Complaint fails to identify who Ware "agreed" with, alleges only that she knew of one incident of abuse, and alleges no concrete actions to cover up or perpetuate Pickens' abuse other than a general failure

to report the abuse, the Court cannot draw the inference that Ware intended to join a conspiracy to conceal Pickens' alleged misconduct.

■ The Court dismisses Sosebee. Sosebee was allegedly a good friend of Pickens, who witnessed Pickens "kick, knee, hit, slap, push and shove," students (Compl. ¶ 473), but who nonetheless recommended at a 2006 IEP meeting with Alex's parents that Alex attend Hopewell. (Compl. ¶¶ 470, 473–74.) In addition, Sosebee allegedly retaliated against one of the individuals who finally did report Pickens. (Compl. ¶ 481.) However, other than the fact that Sosebee allegedly recommended that Alex be sent to Hopewell, the Complaint alleges no concrete acts indicating that Sosebee agreed to cover up Pickens' abuse. The Court finds that, under the facts here, recommending that a child attend a certain school or remaining silent during an IEP meeting, when one knows that a teacher at that school is abusive, is not sufficient to infer an agreement to join a conspiracy to conceal that teacher's abuse. While Sosebee presents a close call, the Court views this as more of an omission or failure to act rather than something akin to some of the affirmative steps taken to conceal Pickens' abuse described below.

■ The Court also dismisses, without prejudice, the conspiracy claims against Wadel and McGee. Wadel was Executive Director of the FCSD Services for Exceptional Children from 2004 through 2008. (Compl. ¶ 400.) Wadel received ongoing reports of abuse from 2004 through 2007. (Compl. ¶ 407.) Specifically, Wadel supervised and received reports from Pettes, who (despite Plaintiffs' attempts to sue her) appears from the Complaint to be one of the most persistent documenters of Pickens' abuse. The problem with Plaintiffs' allegations against Wadel is that

there are no specifics about which incidents of mistreatment were brought to Wadel's attention and no specific allegations about what actions Wadel took to conceal and cover up Pickens' abuses.

 McGee was the FCSD social worker at Hopewell from August 2004 through May 2007. (Compl. ¶ 482.) McGee "was informed on more than one occasion that Pickens was abusing and physically punishing disabled children on G–Hall," but failed to report the abuse. (Compl. ¶ 483.) McGee allegedly discussed this course of action with Boyd "by May 2007." (*Id.* ¶ 485.) McGee, as Hopewell's social worker, was an individual charged with receiving reports of abuse under Georgia law. Ga. Comp. R. & Regs. § 160–4–8.04(1)(c) (1990). As with Wadel, there is simply not enough factual material pled that indicates what precisely McGee allegedly did to help conceal incidents of abuse. For example, although McGee was allegedly aware of the November 2004 abuse incidents, there is no allegation that he participated in the decision to predetermine the outcome of Schuette's report.

That being said, given the nature of McGee's and Wadel's positions and their responsibilities, the Court can well imagine that discovery may yield information that might point in their direction and be grounds for the filing of an amended complaint.[39] For that reason, the Court dismisses the conspiracy claims against Wadel and McGee without prejudice.

### 4. Individual Defendants Against Whom Plaintiffs Successfully Plead Conspiracy Claims

#### Boyd

 The Complaint alleges that Boyd is the second most culpable person for Pickens' alleged abuse, behind only Pickens herself. Boyd allegedly discouraged re-

porting, covered it up by participating in the decision to predetermine the outcome of the 2004 social worker's report, and cultivated an "atmosphere of intimidation" where reporting of abuse was discouraged. (Compl. ¶¶ 271–276.) These actions indicate that Boyd intended to cover up Pickens' abuse from 2004 onward. The Complaint plausibly alleges that as a result of this plan to conceal and cover up Pickens' abuse, Alex was abused. The Complaint has therefore fairly alleged a conspiracy claim against Boyd. Because Plaintiffs have pled facts that may support the inference that Boyd acted with actual malice and is therefore not entitled to official immunity, they have sufficiently alleged conspiracy claims as well.

#### Merritt

 Merritt was the IST for Special Education at Hopewell, and the "supervisor" for G–Hall where Alex's classroom was located. (Compl. ¶ 301.) She held this position between 2004 and 2007, the time period most relevant to the Complaint. Eight individuals reported Pickens' abuse to Merritt. (Compl. ¶ 304.) These reports covered the gamut of abusive conduct that Pickens allegedly engaged in. Individuals reported to Merritt that Pickens was rubbing her breasts in a student's face, hitting that same student in the head, kicking and kneeing that same student; and "pushing, shoving, [and] jerking Alex" down to the ground and abandoning him for long periods of time in a room without supervision. (Compl. ¶¶ 308–11.)

When Merritt received reports of abuse from subordinates, she failed to push the reports higher up the chain, falsely informed school employees that their reports were being passed on and taken care of, and engaged in actions that could be

---

**39.** There is no guarantee the Court would permit such an amendment, and Plaintiffs' counsel should be cautious about seeking any amendment.

viewed as retaliatory—including forcing an employee reporting abuse to meet with Pickens, and telling Pickens when someone had reported her. (Compl. ¶¶ 312, 325, 327, 330.) These allegations set forth a constant, years-long course of action by Merritt that may have prevented the disclosure of Pickens' abuse. Merritt allegedly retaliated against individuals who sought to report Pickens' abusive conduct, and contributed to the "atmosphere of intimidation" that Boyd allegedly cultivated at Hopewell. (*Id.*; Final Decision ¶ 27.) Plaintiffs plausibly plead that Merritt's actions are causally related to the underlying constitutional wrongs and that she agreed with Boyd and others to cover up or suppress reports of Pickens' abuse.

### Shaffer

 Shaffer was the principal at Pickens' first school, Holcomb Bridge, from 2002 through at least 2004. (Compl. ¶ 2009.) During his time there, he received "multiple" reports of Pickens' abuse. (Compl. ¶ 211.) Plaintiffs allege that Shaffer met with other FCSD employees as part of the "plan and understanding" to allow Pickens to continue being a FCSD teacher of significantly disabled students." (Compl. ¶ 213.) The important allegations against Shaffer are that he (1) rejected Pettes' recommendation to terminate Pickens' contract in 2004 and (2) approved Pickens' transfer from Holcomb Bridge to Hopewell, despite the fact that he allegedly knew of Pickens' abuse.[40]

These allegations (barely) plausibly suggest that Shaffer agreed with a plan to conceal Pickens' abuse, which ultimately allowed the abuse to continue. And Shaffer allegedly assisted in this plan by (1) refus-

ing to fire Pickens despite the recommendation of a FCSD staff member and (2) agreeing with Reece to transfer Pickens to another school, thereby passing the buck for his allegedly abusive employee.

### Young

Young was "the FCSD Human Resources Administrator from 2003 to 2007." (Compl. ¶ 218.) He "reported to Ron Wade." (*Id.* ¶ 219.)

 The Court finds that Plaintiffs have plausibly—if again only barely—stated a claim against Young under a § 1983 conspiracy theory. This is due to one important allegation: after the school nurse Reddick reported Pickens in November 2004 for abusing children, Young allegedly communicated with several other senior FCSD officials, who then collectively decided to predetermine the outcome of a social worker's investigation that had been triggered by the report. (*Id.* ¶ 223.) Allegedly these individuals directed that "Pickens would not be reported to DFACS or the police or any other government agency" as a result of the investigation. (*Id.* ¶ 224.) And the Court reads the Complaint as alleging that these individuals, including Young, knew specifically that Pickens had "hit Jake Marshall in the head hard frequently," "spray[ed] Lysol on a child numerous times," (*Id.* ¶ 223), and called multiple students "little fuckers" and "little shits." (*Id.* ¶¶ 247.) The Complaint also alleges that Young declined to authorize an investigation into the potential abuse of students other than Jake Marshall, after the May 2007 incident where Jake was found strapped to a chair covered in feces, was reported. (*Id.* ¶ 230.)

---

**40.** The Complaint does not directly allege that Shaffer was responsible for this transfer. Instead, the Complaint alleges that another defendant, Reece, approved of the transfer of Pickens to Hopewell and G–Hall. (Compl. ¶ 384.) However, based on the fact that Shaf-

fer was principal from the transferor school, and the Complaint alleges he had authority to "reassign teachers," (Compl. ¶ 210), it is plausible to infer that Shaffer at the very least condoned or approved the transfer.

These allegations indicate that Young (1) knew of the serious nature of Pickens' abuse and (2) knew that the abuse was being perpetrated against multiple students, but (3) still elected to suppress or predetermine the resulting social worker's investigation. The Complaint therefore pleads facts that support the inference that Young knew that Pickens was engaging in seriously abusive misconduct in 2004 and after but still took action in concert with other FCSD officials to conceal and ignore that misconduct, thus allowing Pickens to continue to harm students, including Alex. The Court finds these specific allegations are sufficient to infer an agreement to conceal Pickens' alleged abuse, and this saves (perhaps just for now) Plaintiffs' claims against Young.

**Vanairsdale**

■■■ Michael Vanairsdale was "the acting superintendent" and then-superintendent of FCSD from October 2003 to February 2005. (Compl. ¶ 242.) Vanairsdale was allegedly informed of Pickens' alleged abuse in November 2004, and, like Young, allegedly participated in the decision with other senior FCSD personnel to determine "what the outcome of the social worker's report would be:" that the alleged abuse would not be reported. (Compl. ¶ 246.) As with Young, the Complaint alleges that Vanairsdale knew of the serious nature of the abuse and knew that it was perpetrated against multiple students. (Compl. ¶ 247.) This is sufficient, at this stage, to plead an agreement to suppress reports of Pickens' abuse and an "overt act"—the doctoring of the social worker's report—necessary to state a § 1983 conspiracy claim. *Jordan,* 2009 WL 1410082 at *7 (declining to dismiss conspiracy claims under § 1985(3) when the "allegations suggest that Defendants acted based on interests of self preservation when confronted with reports of a sexual assault at school on their watch").

**Denmark**

Denmark was "FCSD Area Superintendent with supervisory responsibilities over ... Hopewell staff from 2004 to 2007." (Compl. ¶ 362.) This time frame is highly relevant to the Complaint, as it encompasses both the period when Alex was actually abused and the two most serious reports of Pickens' abuse against other students (in 2004 and 2007).

■■■ According to the Complaint, Denmark agreed with "[Superintendent' Vanairsdale, Reece, Boyd, Lynch, and Young not to report" the November 2004 incident concerning Pickens' abuse, and participated in the decision to predetermine the outcome of Schuette's social worker's report. (Compl. ¶ 365.) The Complaint also alleges that Denmark was advised of the verbal and physical abuse of "one or more disabled children, Jake Marshall," and also generally alleges that Denmark learned in November 2004 that Pickens was "abusing numerous disabled students." (Compl. ¶¶ 364, 367.) Finally, Boyd allegedly informed Denmark of the May 2007 incident where Alex's classmate, Jake Marshall, was found alone in a room in G–Hall, covered in feces. Despite this, Denmark and Boyd together allegedly declined to tell Jake Marshall's parents of the incident, in violation of the school board's policy. (Compl. ¶ 366; Final Decision ¶ 39.) The Complaint therefore alleges that Denmark failed to disclose at least two separate serious incidents of student abuse in 2004 and 2007 to students' parents, and that other FCSD employees joined her in agreeing to cover up Pickens' abuse both times.

Therefore, the totality of the facts alleged against Denmark plausibly suggest that she took concrete actions that resulted in (1) the concealment of Pickens' abuse; (2) Pickens' continued employment as a special education teacher; and (3)

ultimately, Pickens' abuse of other children, such as Alex.

### Lynch

 Lynch was the "FCSD Superintendent of Secondary Personnel ... as of November 2004." (Compl. ¶ 371.) Lynch allegedly was aware of reports that in 2004 Pickens was "hitting [one student] in the head hard frequently, calling him vile names, spraying Lysol on a [different] child numerous times, and restraining a disabled child's arm" to a chair. (*See* Compl. ¶ 223.) And he was, again, allegedly part of a group of senior FCSD officials who participated in the November 2004 decision to predetermine the outcome of Schuette's social worker's report. (Compl. ¶ 375.) While the Complaint alleges little else in the way of facts about Lynch's involvement, the Court finds that his alleged participation in the significant 2004 decision to quash a FCSD social worker's report is sufficient to state a conspiracy claim at this early juncture.

### Reece

 Reece was the FCSD Chief Human Resources Officer from 2004 through 2006. (Compl. ¶ 379.) There are two important facts that counsel against dismissing Reece at this early stage. First, he was again allegedly part of the group of FCSD senior officials who collectively agreed to predetermine the outcome of Schuette's 2004 social worker's report. (Compl. ¶ 225.) Second, Reece allegedly was also informed by Shaffer, the Holcomb Bridge principal, that Pickens was "abus[ing] ... disabled children with significant disabilities." (Compl. ¶ 381.) Despite this information, Reece allegedly "approved of the transfer of Pickens to Hopewell to the G–Hall, which was a segregated hall where only significantly disabled children had classrooms, making it easier for Pickens to abuse" them. (Compl. ¶ 384.)

The Court again finds plausible the allegation that Reece participated in the decision to mute a 2004 social worker's investigation, and, instead of taking any proactive steps to protect children, transferred Pickens to Hopewell's special education hall where Pickens alleged abusive conduct was less likely to be observed or reported.

### Beasley

 Beasley was the director of FCSD Social Work. He received the November 2004 report of abuse from Reddick. Beasley, after apparently consulting with other senior FCSD officials, including Vanairsdale, Lynch, Denmark, Reece, Young, and Boyd, allegedly instructed Schuette, the investigating social worker, to make a finding of no abuse. (Compl. ¶ 389). This directly contradicted his department's protocol. (Compl. ¶ 388.)

These facts, if true, plausibly suggest that Beasley agreed with other senior FCSD officials to suppress and conceal evidence of Pickens' abuse in violation of his own department's policies. This, in turn, may plausibly have allowed Pickens to continue her employment as a teacher and abuse students, including Alex. Again, the Court anticipates grappling with causation issues with respect to Beasley, but that is better dealt with on a developed record.

### Schuette

 Stephanie Schuette was a "FCSD social worker from 1998 until at least December 2014." (Compl. ¶ 340.) Schuette investigated the November 2004 report of abuse, and was directed by her supervisor, Beasley, to "not ... find the matter abuse" or report it. (Compl. ¶ 348.) More specifically, the Complaint alleges that Schuette omitted important information that she had learned in the course of her investigation, like that Pickens was hitting a student on the head hard enough to hurt, slapping a student's hands, and

putting him in a room alone. (Compl. ¶¶ 359–60.) The Complaint alleges that Schuette made these alterations to her 2004 report despite being "concern[ed] about Jake's safety." (Compl. ¶ 356.) In addition, Plaintiffs allege that Schuette tampered with her files to cover up her actions in this matter (Compl. ¶ 358.)

Schuette is therefore allegedly at the center of the supposed top-down decision to not report Pickens in the fall of 2004, despite knowing that Pickens had abused multiple children. If in fact Schuette altered her report in response to the orders of her superiors, that may suggest that she agreed to the plan to conceal Pickens' abuse and took the concrete action to further that aim. Such concealment may have allowed Pickens to remain on the job, all the while abusing children like Alex. This is sufficient on a motion to dismiss.

#### Thompson

 Thompson was an assistant principal at Hopewell between at least November 2004 and November 2008, the years most relevant to this Complaint. (Compl. ¶¶ 486–87, 490.) Thompson was allegedly "directly" informed of Pickens' abuse in the fall of 2004, and thus knew of Pickens' abuse "for almost three school years." (Compl. ¶¶ 490, 492.)

Thompson took a handful of actions that are sufficient to support the inference that he agreed to join a plan of covering up Pickens' abuse. First, Thompson allegedly refused to cooperate with the November 2004 social worker's investigation. (Compl. ¶ 490.) He also allegedly met with Boyd, Merritt, and others to discuss Pickens' abuse, and allegedly agreed to not discipline or report Pickens in 2004. (Compl.

¶¶ 489–90.) Next, in May 2007, after Jake Marshall was discovered strapped to a chair covered in feces, he instructed employees on G–Hall that they were not permitted to discuss that incident, or Pickens' abuse in general, with anyone—including parents. (Compl. ¶ 497.) Third, Thompson allegedly told mandatory reporters that Pickens' abuse was being addressed, when in fact it was not. (Compl. ¶ 495.) Finally, Thompson also allegedly retaliated against the individual who reported Pickens in 2007.[41]

Together, these facts support the inference that Thompson agreed to actively conceal Pickens' abuse, and to stymie efforts of Hopewell teachers to address and disclose it. This also is sufficient at the motion to dismiss stage.

#### Weinmann

 Weinmann was the IST at Hopewell from 2006 "to some years thereafter." (Compl. ¶ 508.) There are two specific incidents that Plaintiffs allege that Weinmann took that suggest she agreed with the alleged plan to conceal Pickens' abuse. First, Weinmann allegedly instructed "G–Hall staff not to talk at all about Pickens and her abuse and to not tell any of the children's parents" of the abuse. (Compl. ¶ 510.) According to Plaintiffs, this amplified Alex's harm because it prevented Alex's mother from learning about the abuse so she "could obtain proper intervention, medical treatment, and support for Alex." (Id.)

Second, Weinmann allegedly had access to Pickens' and Merritt's emails from 2004 through 2007, and "deleted some or all of them." (Compl. ¶ 512.) Together, these

---

41. Because Thompson's alleged retaliation against the teacher who reported Pickens' abuse in 2007 relates to a harm inflicted on someone besides Pickens' students, it is insufficient, on its own, to support a conspiracy claim. However, taken in conjunction with Thompson's other actions to silence teachers who wanted to disclose the abuse to parents, it suggests a pattern of enforcing the "atmosphere of intimidation" that Boyd, Thompson's supervisor, allegedly cultivated.

facts support the inference that Weinmann knew wrongdoing had occurred, and was working to conceal it. Thus, these facts are sufficient to infer—if only barely—that Weinmann took affirmative actions to conceal Alex's abuse, in concert with other FCSD employees.

### Wade

 Wade was "FCSD Assistant Superintendent from 2004 to 2005" and "FCSD Chief Human Resources Officer from 2006" through at least 2009." (Compl. ¶¶ 513, 518.) Wade was therefore employed by FCSD during the most relevant time period for the purposes of the Complaint.

The Complaint alleges that Wade acted with Wilson (the FCSD superintendent), to conceal evidence of Pickens' abuse. (Compl. ¶ 514.) More specifically, the Complaint alleges that Wade and Wilson together agreed to prevent a criminal investigation in 2006 or 2007, and intentionally decided not to inform Alex's parents of the fact that he had been abused. (Compl. ¶ 529.) Drawing all inferences (generously) in Plaintiffs' favor, the Complaint alleges specific actions (a decision not to permit a criminal investigation, and a decision to withhold information from Alex's parents) within a reasonably specific timeframe (2006 and 2007).

Plaintiffs also allege that Wade met with the FCSD chief of police, Chandi Ashmore in 2009, and directed her not to investigate Pickens' alleged abuse. Instead, Wade allegedly directed Ashmore only to investigate whether or not FCSD had *reported* the abuse. While Alex's parents had likely found out about the abuse by this time, this fact viewed in the light most favorable to Plaintiffs supports the inference that Wade was continuing to try and hide the scope of Pickens' abuse. Taken together, these facts allege a plausible conspiracy claim. The Complaint alleges that Wade took discrete actions to cover up abuse, in an identifiable time frame, and in concert with other participants in the alleged conspiracy.

### Wilson

Wilson was the FCSD Superintendent from 2005 through 2008. The Complaint alleges that "Wilson agreed with Wade that no criminal investigation [of Pickens' abuse] would occur" in "2006 and 2007," (Compl. ¶ 529) and that Wilson, alongside Wade, withheld information about Alex's abuse from his parents. (*Id.*)

As is discussed above, the Court is permitting Plaintiffs to proceed, for now, on a theory that the post-abuse cover up may have exacerbated or prolonged Alex's injuries, resulting in the kind of causation needed to sustain a § 1983 conspiracy claim. Because Wilson allegedly acted to cover up Alex's abuse over the span of two years, withheld information from Alex's parents, and stymied a potential investigation into the scope of Pickens' abuse, dismissal is inappropriate. (Compl. ¶¶ 523, 529); *see Weiland,* 792 F.3d at 1328 (complaint sufficiently alleged § 1983 conspiracy claim because conspiracy count stated a causal connection between the cover-up and the deprivation of the plaintiff's rights).

### Kanner

 Cindy Kanner was "the confidential secretary to the FCSD Human Resources Department from 1986 to 1994" and "a FCSD Human Resources Specialist from 1994 forward." (Compl. ¶ 533.) Kanner allegedly "acted with others to alter government documents and destroy evidence, including tape recorded interviews and the outside investigative report of Pickens' abuse," or, alternatively, "knows who did alter the investigative reports and why and who destroyed or kept certain taped interviews." (Compl. ¶ 537.) Specifically, Kanner allegedly worked with Wade and Wilson to cover up evidence of Pickens' wrongdoing. The Court has already

found that Plaintiffs have pled that Alex's condition deteriorated as a result of FCSD's alleged cover up of Pickens' abuse. As Kanner allegedly participated in that cover up, dismissal is inappropriate at this juncture. However, the Court is skeptical that any claims against Kanner will survive summary judgment for a variety of reasons, including that Kanner may have been simply acting pursuant to the order of her superiors. The Court doubts that liability against Kanner is appropriate if that is indeed the case.

## K. Negligent Hiring and Supervision

The Court next turns to Plaintiffs' claims for Negligent Hiring. The Court **DISMISSES** the claims for negligent hiring as to all Defendants and **DISMISSES** the negligent supervision claim as to all Defendants save Boyd. (Compl. ¶ 554.) Official immunity applies to these claims. *Carter v. Butts County, Ga.,* 110 F.Supp.3d 1325, 1354 (M.D.Ga.2015) ("negligent hiring and retention claims are barred by sovereign and official immunity" in Georgia); *Carter v. Glenn,* 249 Ga.App. 414, 548 S.E.2d 110, 113 (2001) (affirming grant of summary judgment to city employees on basis of official immunity and dismissing negligent hiring claims). As described above, Plaintiffs failed to plausibly plead malice for any FCSD officials besides Pickens and Boyd, and thus failed to sufficiently allege a negligent hiring claim against almost all Defendants. However, as discussed above, Plaintiffs have sufficiently pled facts that may support the inference of actual malice against Boyd, and so the Court does not dismiss the negligent supervision claim against her. The Court does agree with Boyd that Plaintiffs have abandoned their state law negligent hiring claim against her by conceding that Boyd "did not originally hire Pickens at Holcomb Bridge." (Doc. 109 at 12.)

## L. Supervisory Liability Against Individual Defendants for Constitutional Claims

Finally, the Court addresses Plaintiffs' § 1983 claims against 15 of the Individual Defendants under a supervisory theory of liability. Although Boyd moved to dismiss these claims, the Individual Defendants did not. This is possibly because this cause of action was buried in the section entitled "Supervisory Liability—Negligent Hiring and Supervision Against Defendants Named Herein." (Compl., Count 23.) The Individual Defendants appeared to assume that these claims were solely based on state law, as they argued that they should be dismissed on the basis of sovereign and official immunity. (FCSD's Motion, Doc. 87–1 at 77–80) (arguing that "these Defendants are entitled, under Georgia law, to invoke the protection afforded by sovereign immunity," and that "the doctrine of official immunity bars recovery" for those claims, and claiming in the following pages that Plaintiffs failed to plead that the defendants acted "with actual malice").

Plaintiffs allege that Boyd, Merritt, Denmark, Lynch, Thompson, McConnell, Wadel, Pettes, Shelley, Shaffer, Faulkner, Vanairsdale, Reece, Young, and Ware are liable "to Alex in their supervisory capacities for the wrongful actions and violations of Alex's rights set forth in Counts Two through Twenty Two." (Compl. ¶ 544.) The Court has dismissed many of these claims against the Individual Defendants for a variety of reasons: because they state claims that do not exist (8th amendment claim) or are duplicative (4th amendment claim); because they attempt to state statutory claims against individuals who cannot be sued under the provisions Plaintiffs cite (ADA and Section 504 claims); or because they fail to allege malice with respect to the state law claims, and therefore cannot overcome immunity.

The Court therefore **DISMISSES IN PART** this Count as to all Defendants [42] named in this count **except** with respect to the § 1983 supervisory liability claims for: (1) denial of Alex's substantive due process rights under the United States constitution; (2) denial of Alex's procedural due process rights under the United States constitution; and (3) denial of Alex's equal protection rights under the United States constitution.

The Court notes that this leads to a somewhat awkward situation where certain individuals have supervisory liability claims pending against them, but the conspiracy claims against them have been dismissed. However, without an actual motion or briefing from Defendants on this issue, the Court must refrain from dismissing these particular Defendants.

Plaintiffs, for their part, should seriously consider whether their resources are well-spent pursuing all of these individuals under a supervisory liability theory under which they will be required to show "deliberate indifference," especially when the Court has found that Plaintiffs have failed to plead that some of these individuals agreed to join a conspiracy to cover-up Pickens' abuse of children because these individuals took steps that appeared to be aimed at stopping or disclosing the abuse.

## V. CONCLUSION

The Parties should refer to pages 4 through 7 of this Order for a summary of its conclusions.

Pickens' Motion for Judgment on the Pleadings [Doc. 104] is **DENIED WITHOUT PREJUDICE**.[43]

Boyd's Motion to Dismiss [Doc. 101] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to the ADA and Section 504 claims against Boyd, as to the Fourth Amendment claim (Count 11), as to the cruel and unusual punishment claims (Counts 18 and 19), and as to the state law negligent hiring claim. The Motion is **DENIED** as to all other claims.

FCSD's Motion to Dismiss [Doc. 87] is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to the Fourth Amendment claims (Count 11), and the cruel and unusual punishment claims (Counts 18 and 19). The Motion is **DENIED** as to all other claims still pending against FCSD.

The Individual Defendants' Motion to Dismiss [Doc. 87] is **GRANTED IN ITS ENTIRETY** as to the following Defendants: Etris, Butler, Averett, White, McGee, and Sosebee.

The Individual Defendants' Motion to Dismiss [Doc. 87] is **GRANTED** except as to Count 23 for § 1983 supervisory liability for violations of (1) Plaintiff's federal substantive and procedural due process rights and (2) Plaintiff's federal equal protection rights as to McConnell, Pettes, Shelley, Faulkner, Wadel, and Ware.

The Individual Defendants' Motion to Dismiss is **GRANTED** except as to Count 22 for § 1983 conspiracy to violate (1) Plaintiff's federal substantive and procedural due process rights and (2) Plaintiff's federal equal protection rights as to Weinmann, Beasley, Schuette, Wilson, Kanner, and Wade.

---

42. The negligent supervision and § 1983 supervisory liability claims remain pending against Boyd, as discussed herein.

43. The Court received an e-mail from Plaintiffs' counsel in the fall that indicated that a settlement was forthcoming. A voluntary dismissal has been filed in the companion case, but has yet to be filed here. The Court has heard no indication suggesting that the settlement with Pickens in this matter has fallen apart, and so declines to rule on Pickens' motion until it hears otherwise.

The Individual Defendants' Motion to Dismiss [Doc. 87] is **GRANTED** except as to Count 22 for § 1983 conspiracy liability and Count 23 for § 1983 supervisory liability for violations of Plaintiff's federal substantive and procedural due process rights and (2) Plaintiff's federal equal protection rights as to Merritt, Denmark, Lynch, Thompson, Shaffer, Vanairsdale, Reece, and Young.

The Parties are **DIRECTED** to confer and submit a joint statement within fourteen (14) days of this Order stating their positions whether or not Plaintiffs' Count 1 for attorneys' fees is ripe for adjudication.

The Parties are further **DIRECTED** to confer about an amended Joint Preliminary Report and Discovery Plan in advance of an in-person discovery conference that the Court intends to hold. The Parties should submit a proposed plan (indicating their disagreements) within 14 days of this Order. The Parties should refrain from underlining the entirety of the text in the plan.

**IT IS SO ORDERED** this 31st day of March, 2016.